**EAGLE SNACKS, INC., Plaintiff,**

v.

**NABISCO BRANDS, INC., Defendant.**

**Civ. A. No. 85–1552.**

United States District Court,
D. New Jersey.

Dec. 20, 1985.

John F. Crane, Kuttner, Toner & DiBenedetto, Roseland, N.J., V. Bryan Medlock, Jr., Richards, Harris, Medlock & Andrews, Dallas, Tex., Jerre Swann, Kilpatrick & Cody, Atlanta, Ga., for plaintiff.

Jeffrey W. Lorell, Clapp & Eisenberg, Newark, N.J., Frank J. Colucci, Robert Weisbein, New York City, for defendant.

## OPINION

HAROLD A. ACKERMAN, District Judge.

This is an action for common law trademark infringement and unfair competition under § 43(a) of the Lanham Act, 15 U.S.C. § 1125(a). The Court has jurisdiction thereof under 15 U.S.C. § 1121, and Title 28 U.S.C. § 1338. Venue is proper in this district under Title 28 U.S.C. § 1392(b).

Plaintiff, Eagle Snacks, Inc., is a Delaware corporation. It is a wholly owned subsidiary of Anheuser-Busch Companies, Inc. and has its principal place of business at One Busch Place, St. Louis, Missouri.

The defendant, Nabisco Brands, Inc., is also a Delaware corporation, having its principal place of business at Nabisco Brands Plaza, Parsippany, New Jersey. Both plaintiff and defendant develop, manufacture, package, advertise and offer for sale peanuts and other nut meat products.

Beginning in 1980, Eagle started marketing a nut product, made according to a process of coating nuts with honey and roasting them, using the words "Honey Roasted", which it subsequently changed to "honey Roast."

On April 2, 1985, contemporaneously with Nabisco's launch of its PLANTERS honey roasted nuts into the marketplace, Eagle commenced this civil action by way of Order to Show Cause, seeking a temporary restraining order and, thereafter, a preliminary injunction to enjoin Nabisco's use of the words "Honey Roast" and "Honey Roasted" in connection with its product.

On April 2, 1985, I denied Eagle's application for a temporary restraining order and scheduled an evidentiary hearing on Eagle's motions for preliminary injunction beginning on April 29, 1985.

Testimony was given by Jerome Warren Ohlsten, plaintiff's first expert in market research; Robert C. Sorensen, plaintiff's second expert in market research; H. Smith Kirman, a retired individual who worked in the business of the sale of peanuts; James Kalbach, President of Edwards Freeman, a manufacturer of peanut products; Allen William Sherman, Vice President of Brand Management for Eagle Snacks; Sumner Catlin Putnam, a Nabisco Brands employee who was involved in the honey roast nuts marketing effort; Oris Edwin Holloway, a manager of nut technology for Nabisco Brands; and Ivan Ross, defendants' expert in market research.

On April 19, 1985, Nabisco served and filed its Answer and Affirmative Defenses. On the same date, Nabisco served and filed a cross-motion to dismiss the complaint, pursuant to F.R.Civ.P. 19, for failure to join Fisher Nut Company, a division of Beatrice Foods, Inc. and/or Beatrice Companies, Inc. ("Beatrice"), as an indispensable party.

The evidentiary hearing was held from April 29, 1985 to May 2, 1985. I make the following findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure.

In 1978, Anheuser-Busch's New Products Development Group decided to investigate a line of snack products that would complement its existing business.

As part of its search for new snack food products, Anheuser-Busch contacted Carolina Peanuts of Robersonville, a company in North Carolina that manufactured "Honey Bunnies," a sweet-salty nut product with a totally new taste profile.

Anheuser-Busch decided to promote this peanut product, and, after reformulating the product to modify its taste profile, Anheuser-Busch began to sell the product as "Honey Roasted" peanuts. There were several reasons why the name "Honey Roasted" was selected. Allen Sherman, who was in Anheuser-Busch's New Product Development group and who was involved in selecting the words "Honey Roasted," testified that "Honey" was a good word from the consumer's standpoint because it connotated "good for you", "healthful" and "sweetness." "Roasted" was selected because it had a good connotation of "aromatic flavoring once the product is heated."

The new "Honey Roasted" peanuts were first sold by Anheuser-Busch in 1980. In that same year, in an effort to strengthen the trademark, Anheuser-Busch initiated steps to change the mark to "Honey Roast," and the change was completed by January, 1981.

In a further attempt to "strengthen" its purported trademark, Eagle in 1983 caused the letters "TM" to be placed above the word "Roast" and implemented the use of the word "Brand" to modify the mark. Eagle's own marketing expert, Mr. Jerome Ohlsten recognized, however, that use of the letters "TM" and/or the word "Brand" in conjunction with a common or descrip-

tive word would not make that word into a brand name or trademark. For example, "shredded wheat", "ginger snaps" or "raisin bran" would not be a brand name merely because used in connection with the letters "TM" or "Brand."

Eagle does not own a federal trademark registration of "Honey Roast." Eagle did not file an application for Registration of "Honey Roast" with the United States Patent and Trademark Office ("PTO") until June 2, 1983, nearly three years after the purported mark was adopted (Application Serial No. 428,563). Eagle's application for registration of "Honey Roast" has been opposed by Beatrice, who on June 18, 1984 filed a Notice of Opposition with the PTO, Opposition No. 69,515. In its Notice of Opposition, Beatrice claims, *inter alia*, that it has the exclusive right to use the words "Honey Roasted" for peanuts, and that Beatrice is the prior user of these words for nut products in commerce. Beatrice also claims that Eagle's statements in its application in the PTO were false and fraudulent and also omitted material information about prior use by Carolina Peanut Company, which Beatrice claimed packaged peanuts for it. The opposition is currently pending before the Trademark Trial and Appeal Board ("TTAB").

On December 19, 1983, Fisher Nut Company, a division of Beatrice, filed an application (Application Serial No. 457,568) to register "Honey Roasted" as a trademark to be used in the marketing and sale of processed nuts. Fisher claimed a date of first use on May 10, 1978 and a date of first use in commerce of January, 1978 of "Honey Roasted", approximately 2½ years prior to the date of first use of "Honey Roast" claimed by Eagle. On June 21, 1984 the PTO denied Fisher's application on the ground that the words "Honey Roasted" are "merely descriptive" because the term "immediately describes the fact that the goods are made with honey and roasted." On November 2, 1984, Fisher requested that its application be suspended pending completion of the opposition proceeding.

Taking advantage of Anheuser-Busch's distribution network, Eagle honey roast nuts were initially sold to taverns and bars, which are referred to in the trade as "on-premise" establishments. In the fall of 1981, Eagle began attempts to expand its distribution of its nut product to "off-premise" establishments such as convenience stores, grocery stores and supermarkets, and to airlines.

Eagle honey roast nuts are currently available in approximately 100 markets east of the Mississippi River and in 30% of the markets nationwide. At the time of the hearing, Mr. Alan Sherman, Eagle's Vice President of Brand Management, testified that Eagle honey roast nuts would be made available throughout the United States within thirty (30) days.

Plaintiff has advertised its "Honey Roast" nuts in tens of millions of fliers mailed to households or included in newspaper supplements. Plaintiff has extensively sampled the product with airline passengers. In 1981, plaintiff sold 1,460,000 units to airlines; in 1982, 37,000,000 units; in 1983, 76,000,000 units; and in 1984, 104,000,000 units. Plaintiff's efforts have met with commercial success. Its sales, for example, have grown from $2,336,000 in 1981 to $6,330,000 in 1982; $12,100,000 in 1983; and $27,280,000 in 1984.

One part of Eagle's marketing strategy is the association of its products with the "Eagle" brand name and the association with Anheuser-Busch. All of Eagle's marketing strategy, its advertising, promotional material and packaging for its honey roast nuts contain the name "Eagle" as well as the words "honey roast." At no time have the words "Honey Roast" been used alone to promote Eagle's honey roast nuts.

Advertising and promotional literature prepared by Eagle and distributed to its sales people clearly describes its nut products as being made with honey, "roasted with honey", "roasted in honey" and "a combination of honey and salt and roasted to perfection." In addition, Mr. Sherman, testified that Eagle's sales people promote

its nut products to the trade as being roasted with honey.

When shown a jar of Planters dry roasted nuts where the words "dry roasted" appeared in lower case and asked if the word "honey" were substituted for the word "dry", would that be a descriptive usage of "Honey Roasted", Mr. Ohlsten, a market research consultant called by plaintiffs, testified that it would. Mr. Ohlsten also thought that the words "Honey Roast" would tell the consumer about the type of nuts they would find in the package.

Sugar is the predominant ingredient of the solution with which the nuts are coated. Honey is, however, also contained in the solution used to coat the nut. The nuts absorb the honey through the roasting process and consequently give the nut the honey roasted flavor and color.

Eagle's United States Patent No. 4,161,-545, describes it process of manufacture as a method for making a "honey coated roasted nut." There is some evidence, although minimal, that the press refers to such nuts descriptively as "honey roasted." An article appearing in the *Detroit Free Press* on Tuesday, April 9, 1985, used the words "Honey Roasted" in a descriptive way in referring to Planters' new product.

The words "Honey Roast" or "Honey Roasted" are a short descriptive term for nuts roasted with honey. I found the testimony persuasive of Mr. Oris Holloway, an expert with 17 years of experience in the field of nut technology and also Nabisco's Group Leader of Nut Technology, who unequivocally testified that the words "Honey Roast" and "Honey Roasted" accurately described the process by which the nuts are prepared. Mr. Holloway testified that the blanched nuts are encased in a honey solution and then, either through a dry roasting or oil roasting process, the honey is heated "and consequently heats up the outer layer of the peanut.... By heating it through the honey and the other ingredients, we in a sense are roasting."

In support of its position that the words "Honey Roasted" are recognized by both the industry and the public as being common or descriptive words for processed nuts which have been treated with honey and then roasted, Nabisco conducted a national probability telephone survey. This survey was conducted by Dr. Ivan Ross, Professor of Marketing of the University of Minnesota, School of Management.

The purpose of the Ross survey was to determine whether consumers perceived the words "Honey Roasted" to be a brand name for a nut product or a common or descriptive name.

From a list of randomly generated telephone numbers, four hundred people nationwide who said they were over the age of eighteen were asked to identify whether four test names—Aspirin, Cellophane, Pepsi and M & M's—were brand names or common or descriptive names. In addition to those four choices, two hundred of the respondents were asked whether Honey Roasted was a brand name or a common or descriptive name for a nut product. The other two hundred respondents were asked whether Dry Roasted was a brand name or a common or descriptive name for a nut product. The words Dry Roasted were tested as an exemplar of a term generally regarded in the trade as a common or descriptive name.

Aspirin and Cellophane were selected as common or descriptive names because they are very well known to the public as being product categories.

Pepsi and M & M's were selected as brand names because they are generally regarded by the public as such.

The four test names were rotated to eliminate "order" bias. In addition, there was also a rotation as to whether the respondent was asked: "Would you say that is a common or descriptive or a brand name", or "Would you say that is a brand name or a common or descriptive name." This rotation was employed to eliminate the possibility of systematic bias being introduced as a function of whether the respondent heard "brand" or "common or descriptive" first as applied to a particular name.

The results of the survey were as follows:

(1) 91.5% and 84.75% of the respondents identified Pepsi and M & M's as brand names, respectively;

(2) 91% of the respondents identified aspirin as a common or descriptive name and 91.25% identified cellophane as a common or descriptive name;

(3) Dry Roasted was identified by 91.5% of the respondents to be a common or descriptive name; and

(4) Honey Roasted was identified by 67% of the respondents as being a common or descriptive name. 33% of respondents answered that "HONEY ROASTED NUTS" was a brand name.

The survey results do demonstrate that the words "Honey Roasted" are significantly more apt to be perceived by consumers as the common or descriptive name for a nut product rather than as a brand name, but I do find that the survey was defective in a few minor ways which lead me to discount its results somewhat.

Plaintiffs contend that the survey was based on both a too broad and a too narrow universe. To qualify, a respondent must have used or purchased in the past year an array of five different products, several of which are wholly unrelated—e.g., cellophane and nuts. Accordingly, a number of qualified nut users and consumers may have been eliminated from the Ross universe. Out of a total of 400 interviews completed, 313 potential respondents were eliminated by the five product requirement. On the other hand, there was no effort to eliminate users and consumers who, for taste dietary or health reasons, would have no interest in a honey coated, roasted nut product. While these factors may have narrowed the field of respondents, I do not find that they cause the survey to be defective. Consumers were still interviewed on enough of a random basis to be representative, and whether one actually consumes a product has no bearing on one's perception of the name of the product as a brand name or a common name.

I also do not find plaintiff's concern over the "preconditioning" of respondents warranted. Plaintiff's claim that respondents were told and thus preconditioned in the introductory or "screener" portion of the survey that nuts were a product and were then asked, in effect, whether "honey roasted nuts" was a product or a brand. Dr. Robert Sorensen, plaintiff's expert witness in consumer surveys, testified, "[t]he presence of that word 'nuts' automatically, in my opinion, as a noun, as an object, causes any word coming prior to it, particularly a word ending in 'e-d' ..., to be viewed by the average person as being descriptive." Such an approach does not, however, preclude a consumer from viewing the descriptive word as a brand name. The word "M & M" in a question about "M & M candies" could be perceived as descriptive and still be considered a brand name. A mark is to be viewed in relation to the product it identifies, so I find it only rational to conduct the survey in the manner defendants did.

The only criticism plaintiffs have of defendant's survey which I find material to the weight I accord the survey is that Professor Ross selected two very well known and *coined* trademarks (Pepsi and M & M's) and two very well known and *common* product names (aspirin and cellophane). No words in intermediate categories were included. Because of this, signals may have been given to respondents that in order to be a brand name, a name had to be of the strength of "Pepsi" or "M & Ms."

This factor, however, does not disqualify the Ross survey. It indicates only that I should give less weight to the survey than I otherwise would. It is also an indication that the 67% of the respondents who found "Honey Roasted" to be more like "aspirin" and "cellophane" than "Pepsi" and "M & Ms" may not have found "Honey Roasted" to be as common a name as aspirin or cellophane but could still not call it a brand name as they did not find "Honey Roasted" to have the strength of the Pepsi or M & M mark. It does not follow by any means,

however, that the inclusion of intermediate examples would have given the consumer a more complete understanding of what was being tested and would have produced a higher brand name response for "Honey Roasted Nuts." I find it significant that plaintiffs made no effort to conduct a survey of their own to support their contentions that the results of the Ross survey would have been different had plaintiff's proposed methodology been followed.

In support of its position that the words "Honey Roast" have acquired brand name significance to consumers, Eagle introduced in evidence approximately 8,000 letters, which it had received over the years from consumers inquiring as to where they could purchase Eagle honey roast nuts. Eagle's marketing expert, Mr. Jerome Ohlsten, testified that he reviewed two (2) of the nine (9) boxes of letters, which amounted to approximately 4,000 letters. Of these letters, 80% to 90% use "Honey Roast" with initial capitals, in quotation marks, in all capitals or underlined. Plaintiff's experts found that this indicated a treatment and understanding of the term as a brand name. Defendant's expert witness, Dr. Ross stated that it was not unusual for companies to get large volumes of consumer mail, particularly with respect to new products which are not yet in wide distribution. He testified that typically, when a consumer writes to a company about a particular product, they will have the product in front of them and in order to identify the product they will use all of the terms which are on the face of the product and will often underline them, put them in quotes, or use similar means of emphasis. This does not, however, signify that consumers recognize a particular word or words to be a brand name. For example, Dr. Ross testified that his analysis of thousands of letters written to General Mills regarding its "Betty Crocker" products showed that people would capitalize the "D" in "Devils", the "F" in "Food" and the "C" in "Cake". This does not indicate that consumers believe "Devils Food Cake" to be a brand name. I found Dr. Ross's testimony persuasive in this respect. I would

not find, however, as defendants urge, that the letters do not "shed any light on the question of brand name versus common/descriptive significance." The letters are indicative of the descriptive nature of the term "Honey Roast Nuts" and they are some indication of plaintiff's market penetration.

Dr. Sorensen portrayed the tremendous number of letters received by plaintiff as "a very popular name brand in the making." I do not find the letters indicate so much a brand name in the making as they do consumer demand for a product of this nature.

Defendant Planters enjoys dominance in the grocery store segment of nut marketing. Only by creating consumer demand for its product can plaintiff hope to obtain shelf space. As the Vice President of Brand Management for Eagle Snacks testified, "it is possible if you develop a strong enough advertising campaign, if you can get enough people across the country demanding your product, [grocery store managers] will then have to succumb to the consumer demand."

Plaintiff's extensive sampling and promotion have generated substantial unmet demand for its "Honey Roast" product. Plaintiff has striven to meet that demand and has repeatedly increased its productive capacity and continues to investigate additional production facilities. Thus far, however, it has not been able fully to keep pace with consumer demand.

In mid-1984, defendant's Planters Peanut group decided to enter the honey coated, roasted nut category and adopted "Honey Roast", as the descriptive term for its new product. Planters fully appreciates the "opportunity" created by plaintiff's efforts. It recognized, for example, that in 1983, honey coated roasted nuts accounted for 80% of the growth in the oil roasted category. In a 1984 "HONEY ROAST BUSINESS PROPOSITION," Planters further observed that plaintiff had done a "marvelous job of national sampling (via airlines since '79)...." and that "[t]his is definitely

a viable business segment, which threatens the Planters current nut franchise."

Planters was aware of plaintiff's use of the term "Honey Roast" but did not obtain a trademark search before employing "Honey Roast" for its product.

Prior to Nabisco's entry into the honey roasted segment of the edible nut market, there were other companies making and selling honey roasted nuts, and using the words "Honey Roasted" on their product labels to describe their product to the public. As of the date of the hearing, the words "Honey Roasted" were in widespread use.

Nabisco introduced ten different nut products currently being marketed with use the words "Honey Roasted" on their packaging. They are:

1. FISHER honey roasted nuts—a product of Fisher Nut Company, a subsidiary of Beatrice;

2. SAV–ON honey roasted nuts—distributed by American Stores Buying Company;

3. SKAGGS ALPHA BETA honey roasted nuts distributed by American Stores Buying Company;

4. CHIPPER's honey roasted nuts—a product of Chipper's Nut Company;

5. KITCHEN KORNER honey roasted nuts—a product distributed by Long's Drug Stores;

6. EVON's honey roasted nuts—a product of John F. Sanfilippo & Son, Inc.;

7. GOURMET FOODS "New" honey roasted nuts—a product of Calnut, Inc.,;

8. BARREL 'O FUN honey roasted nuts;

9. HADLEY'S FRUIT ORCHARDS honey roasted nuts; and

10. RED SEAL honey roasted nuts.

Of the above uses of the words "Honey Roasted", the use of Fisher (Beatrice) is the most significant—since Beatrice's Fisher subsidiary is a major competitor in the edible nut market. Fisher, however, has not given its product active promotional support and Fisher and plaintiff are currently adversaries in a proceeding before the Trademark Trial and Appeal Board of the Patent and Trademark Office. Plaintiff has objected in writing to the use of "Honey Roasted" by other competitors. Plaintiff plans to pursue these other usages of "Honey Roasted" also.

There is a dispute between the parties as to whether the words "Honey Roasted" are widely used throughout the industry to describe nut products such as those at issue here. I find the credible testimony to be that the term is generally used in the industry, but that use of the term is of recent vintage, in the last two years. I find that plaintiff's use of the term may have been the first, but that it was used as a general descriptive term throughout the industry shortly thereafter.

Nabisco initially used the words "Honey Roast" as the descriptor for its nut product, but in February of 1985 changed the descriptor to "Honey Roasted." The change was made so as to be more consistent with the "oil roasted" and "dry roasted" descriptors widely used throughout the industry and as an attempt to accommodate Eagle in view of its asserted proprietary claim to the words "Honey Roast."

## CONCLUSIONS OF LAW

■ Defendant has moved to dismiss plaintiff's complaint for failure to join Beatrice Companies as a party. I find that this motion is an attempt to raise a *jus tertii* defense.

I agree with Professor McCarthy regarding this defense who stated:

As a matter of policy, *jus tertii* should not be allowed as a defense in any trademark case. *So long as plaintiff proves rights superior to defendant, that is enough.* Defendant is no less an infringer because it is brought to account by a plaintiff whose rights may or may not be superior to the whole world. The plaintiff's speculative dispute with a third party does not concern the defendant.

To permit a *jus tertii* defense would be an unwise judicial policy because it would

expand many trademark disputes far beyond a mere two party conflict. Before plaintiff could prevail, it would have to prove that it was not an infringer of one or more third parties that the defendant can conjure up. If the defense were allowed, would the court then declare that the third party is an indispensable party to the case, or would it permit defendant to act as a surrogate advocate for the third party's rights? By raising *jus tertii,* a defendant could effectively divert attention from its own alleged infringement and become a vicarious avenger of another's purported rights against plaintiff (and assumably not against itself). A case could be expanded beyond reasonable bounds and effectively slowed to a crawl.

2 J. McCarthy, *Trademark and Unfair Competition,* 675 (1974).

Defendant's motion to dismiss is therefore denied.

This civil action involves claims of unfair competition under the Trademark Act of 1946 as amended, 15 U.S.C. § 1125(a) and trademark infringement at common law.

As this matter is before me on application for preliminary injunctive relief, the criteria enunciated by the Third Circuit in *In re Arthur Treacher's Franchise Litigation,* 689 F.2d 1137 (3d Cir.1982) are applicable. Specifically, the moving party must show (1) a reasonable probability of eventual success on the merits; (2) that the movant will be irreparably injured *pendent lite* if relief is not granted. As Judge Garth noted in the *Arthur Treacher's* opinion, a failure to show either of these two essential elements "must necessarily result in the denial of a preliminary injunction." *Id.* at 1143. Moreover, the district court "should take into account, when they are relevant, (3) the possibility of harm to other interested persons from the grant or denial of the injunction, and (4) the public interest. *Id.,* quoting *Oburn v. Shapp,* 521 F.2d 142, 147 (3d Cir.1975). *Accord, Kershner v. Mazurkiewicz,* 670 F.2d 440, 443 (3d Cir. 1982) (en banc); *Constructors Association*

*of Western Pennsylvania v. Kreps,* 573 F.2d 811, 815 (3d Cir.1978).

I turn first to a consideration of the merits of plaintiff's claim. Plaintiff seeks to enjoin defendants from using the terms "Honey Roast" or "Honey Roasted" on its nut products.

■ Under the common law and the Lanham Act, 15 U.S.C. §§ 1051–1127, owners of trademarks are protected from other marks that are likely to cause consumers of the products in question to be confused, deceived or mistaken as to the sources of the parties' services. *See Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589 F.2d 1225, 1228 (3d Cir.1978).

■ The theories of relief advanced under the Lanham Act and the New Jersey common law of unfair competition and trademark infringment are essentially the same claims and substantially the same analysis are involved as to each under the facts of the instant case. *See SK & F CO. v. Premo Pharmaceutical Laboratories, Inc.,* 625 F.2d 1055, 1065 (3d Cir.1980). The basic purpose of both federal trademark law and the common law of unfair competition is to prevent one person from passing off his goods as the goods of another. *See American Steel Foundries v. Robertson,* 269 U.S. 372, 46 S.Ct. 160, 70 L.Ed. 317 (1925). Before any consideration of whether there is a likelihood of confusion, it must be determined whether the words "Honey Roast" or "Honey Roasted" function as trademarks for nuts coated in a honey solution and then roasted. An analysis of this question must begin with a look at the purpose or function which trademarks are intended to serve.

A trademark is any word, name, symbol or device or any combination thereof adopted and used by a manufacturer to identify his goods and distinguish them from those manufactured by others. 15 U.S.C. § 1127. It is a merchandising shortcut which induces a purchaser to select what he wants, or what he has been led to believe he wants. Its function is simply to designate the goods as a product of a par-

ticular manufacturer and to protect his good will against the sale of another's product as his. Once this is attained, the trademark owner has something of value. If another poaches upon the commercial magnetism of the symbol he has crated, the trademark owner can obtain legal redress. *See Mishawaka Rubber & Woolen Manufacturing Co. v. S.S. Kresge Co., supra,* 316 U.S. 203, 62 S.Ct. 1022, 86 L.Ed. 1381 (1942); *United Drug Co. v. Theodore Rectanus Co.,* 248 U.S. 90, 39 S.Ct. 48, 63 L.Ed. 141 (1918).

■ A mark's eligibility for trademark status and the degree of protection afforded to words and terms may be divided into four classes. In ascending order the classes are: (1) generic, (2) descriptive, (3) suggestive, and (4) arbitrary or fanciful. *Educational Development Corporation v. Economy Company,* 562 F.2d 26, 28 (10th Cir.1977). *See also,* 1 McCarthy, *Trademarks and Unfair Competition* (2d Ed. 1984) § 11:1. Defendant contends that plaintiff's mark is a generic one. A generic term cannot become a trademark under any circumstances. *Miller Brewing Co. v. G. Heileman Brewing Co., Inc.,* 561 F.2d 75, 79 (7th Cir.1977), *cert. denied,* 434 U.S. 1025, 98 S.Ct. 751, 54 L.Ed.2d 722 (1978). Thus, no matter how much money and effort the user of a generic term has poured into promoting the sale of its merchandise and what success it has achieved in securing public identification, it cannot deprive competing manufacturers of the product of the right to call an article by its name. *Abercrombie & Fitch Company v. Hunting World, Inc.,* 537 F.2d 4, 9 (2d Cir.1976). This is so because to allow trademark protection for generic terms, even when they have been identified with the first user, would grant a monopoly, since a competitor could not describe his goods as what they are. *CES Publishing Co. v. St. Regis Publications, Inc.,* 531 F.2d 11, 13 (2d Cir. 1975).

■ Close to the generic end of the spectrum are descriptive marks. Descriptive marks are those which "convey an immediate idea of the ingredients, qualities or characteristics of the goods" and which require little imagination or thought to interpret. *Abercrombie & Fitch Company v. Hunting World, Inc., supra,* 537 F.2d at 9. *See also Miller Brewing Co. v. Falstaff Brewing Corp.,* 503 F.Supp. 896, 904 (D.R. I.1980), *rev'd on other grounds,* 655 F.2d 5 (1st Cir.1981). Trademark protection for descriptive marks is extended only where the user has proven secondary meaning. Secondary meaning is the association in the public's mind between a product and its source which occurs when an inherently non-distinctive designation changes to being distinctive of the particular product. *Mishawaka Rubber & Woolen Manufacturing Co. v. S.S. Kresge Co., supra,* 316 U.S. at 203, 62 S.Ct. at 1023; *Scott Paper Company, supra.*

Plaintiff characterizes its mark as suggestive, the next of the four classes. Suggestive terms fall in between fanciful and descriptive terms. *Educational Development Corporation, supra.* The suggestive class was judicially created to fill the need for protection of marks which were neither exactly descriptive or fanciful. *Id.* at 29. These terms require the buyer to use "thought, imagination, or perception to connect the mark with the goods." *Id.*

■ A suggestive mark is protected without any necessity for proving secondary meaning. *McCarthy, supra* § 11:20 at 488.

■ Lastly, there are arbitrary or fanciful terms, commonly designated as "strong marks." These marks "bear so little relation to the product they identify that they are considered entitled to protection against all users." *Field Enterprises Educational Corp. v. Cove Industries, Inc.,* 297 F.Supp. 989 at 994 (E.D.N.Y.1969). I find that although these classifications are simply guidelines, rather than pigeonholes, *see Zatarains, Inc. v. Oak Grove Smokehouse, Inc.,* 698 F.2d 786 (5th Cir.1983), a classification of "descriptive" most accurately indicates the strength and nature of the "Honey Roast" mark.

The mark is clearly not fanciful or arbitrary, and neither party seeks to categorize it as such. "Honey Roast" very logically relates to nut products, is not a unique combination of letters or symbols, and is not a "coined" word. *See, e.g., Telechron, Inc. v. Telicon, Inc.*, 198 F.2d 903 (3d Cir. 1952).

The mark is also not a generic mark, as defendants contend.

Plaintiffs use of initial capitals in letters larger than and above a generic nut designation is a use "as a symbol to attract public attention." *Venetianaire Corp. of America v. A & P Import Co.*, 429 F.2d 1079 (2d Cir.1970).

The clearest test for genericness was discussed by McCarthy in his treatise, and adopted by a number of courts:

> A mark answers the buyer's questions 'Who are you? Where do you come from?' 'Who vouches for you?' But the name of the product answers the question "What are you?' ... [G]eneric designations tell the buyer what the product is, not where it came from.

McCarthy § 12:1 at 520, *citing United States Jaycees v. San Francisco Junior Chamber of Commerce*, 513 F.2d 1226 (9th Cir.1975) and *CES Publishing Corp. v. St. Regis Publication, Inc.*, 531 F.2d 11 (2d Cir.1975), among other cases. The term "Honey Roast" nuts does not directly answer the question "what are you?" The term "honey and sugar coated, roasted" nuts would more properly be the answer to that question. Thus "Honey Roast" and "Honey Roasted" are not generic terms.

Eagle asserts that the words "Honey Roast" are suggestive because "[t]hought and imagination would have to be used to identify the plaintiff's product—which is not merely a nut 'roasted in honey' but one produced by a process which coats the nutmeat or peanut with a salty-sweet coating." The testimony and evidence, however, does not support Eagle's claim.

Although "the descriptive-suggestive borderline is hardly a clear one," McCarthy, *supra* § 11:21, "Honey Roast" lacks the degree of inventiveness or imaginativeness that would put it over the border into the suggestive category. As McCarthy summarizes in his treatise "the more imagination that is rquired on the customer's part to get some direct description of the product from the term, the more likely the term is suggestive, not descriptive. Thus, while a descriptive term directly and clearly conveys information about the ingredients, qualities or characteristics of the product or service, the "suggestive" term only indirectly suggests these things. Judge Weinfeld's formulation of the imagination test in the *Stix* case is often quoted and applied:

> A term is suggestive if it requires imagination, thought and perception to reach a conclusion as to the nature of the goods. A term is descriptive if it forthwith conveys an immediate idea of the ingredients, qualities or characteristics of the goods."

McCarthy § 11:21 at pp. 491–492, *citing Stix Products, Inc. v. United Merchants & Mfrs., Inc.*, 295 F.Supp. 479 (S.D.N.Y.1968). "Honey Roast," while being slightly imaginative, forthwith conveys an immediate idea of the ingredients and qualities of the nut products offered by plaintiff. The testimony of Mr. Oris Holloway, an expert in the field of nut technology, is also persuasive on this issue. In describing the process by which the nuts are made, Mr. Holloway testified that the nuts are in fact roasted in honey. While it is true that the nuts are not submerged in a boiling vat of honey, it is, nonetheless, true that honey solution acts as a heat conductor, thereby facilitating the roasting process.

Similarly, Eagle's own marketing expert testified that the words "Honey Roast" would convey to the consumer the fact that the nuts were roasted in honey and, therefore, could expect that the nuts had a honey roasted flavor. In addition, not only do articles in the press employ the words descriptively, but Eagle's own advertising uses the words in a descriptive sense.

The suggestion of honey or sweetness as an ingredient or characteristic of the nuts

is a direct suggestion in the name "Honey Roast" or "Honey Roasted." Although the process is not exactly that of nuts roasted in honey, the image conjured up by "Honey Roast" or "Honey Roasted" is a sweet, roasted nut.

"Since each tangible product carries with it a 'psychic load' of intangible consumer psychological expectations about the product, a mark could be 'descriptive of the product itself or those intangible expectations, or both.'" *McCarthy* § 11.5 at p. 443. As Allen Sherman, a member of Anheuser-Busch's New Product Development Group, testified, the term "honey" connotes "healthful," "good for you" and "sweetness." Thus, "Honey Roast" is also descriptive of the intangible consumer expectations plaintiffs wish to arouse with their product.

This court finds "Honey Roast" and "Honey Roasted" to be a more indirect description of a product than "Shredded Wheat", which the Supreme Court found to be generic. *See Kellogg Co. v. National Biscuit Co.*, 305 U.S. 111, 59 S.Ct. 109, 83 L.Ed. 73 (1938). The terms "Honey Roast" and "Honey Roasted" are most analogous to the term "Raisin Bran." *See Skinner Mfg. Co. v. Kellogg Sales Co.*, 143 F.2d 895 (8th Cir.), *cert. denied* 323 U.S. 766, 65 S.Ct. 119, 89 L.Ed. 613 (1944). They describe the characteristics of the product accurately, but do so in a slightly creative way. The terms are, however, not so imaginative or creative to be suggestive.

As noted in my Findings of Fact, I have discounted the probative value of the Ross survey somewhat due to its choice of examples on extreme ends of the range of protectable trademarks. "Pepsi" and "M & Ms" are very strong marks, easily categorized as arbitrary or fanciful. "Aspirin" and "Cellophane" are now commonly accepted generic terms. Because of the signals given to respondents that in order to be a "brand" name, a mark had to be of the strength of "M & Ms" or "Pepsi," I find that any conclusion that 65% of the consumers perceive "Honey Roasted" to be generic would be incorrect. This defect would not, however, apply to a conclusion that approximately 65% of the consumers perceive "Honey Roasted" to be descriptive, as that classification is a step above the "Aspirin" or "Cellophane" category. In addition, respondents were asked to choose between the terms "brand name" or "common or descriptive name" to describe each of the marks surveyed. As common names do not warrant the protection that descriptive names sometimes do, consumer response on this question could support a finding of "Honey Roast" as a descriptive mark as well as a generic mark.

Since, however, the results of the survey are confusing due to these problems, all that I will conclude from the survey as it relates to the legal categorization of the mark is that it does not contradict my findings that the "Honey Roast" mark is descriptive.

As stated earlier, trademark protection for descriptive marks is extended only where the user has proven secondary meaning. If plaintiff's mark has not become so associated with its goods "so that the use of the same or similar marks by another company constitutes a representation that its goods come from the same source," there is no false designation and relief will be denied. *Joshua Meier Company, Inc. v. Albany Novelty Manufacturing Co., supra,* 236 F.2d at 147.

■ The burden of proving secondary meaning is on the party asserting it. *Jean Patou, Inc. v. Jacqueline Cochran, Inc., supra,* 201 F.Supp. at 861. The burden is ordinarily considered a heavy one, since one result may be to deprive the public of the free use of the particular term in relation to certain products. Each case must be decided on the facts relating to the impact which the term has had on the public consciousness. *Ralson Purina Company v. Thomas J. Lipton, Inc.,* 341 F.Supp. 129, 134 (S.D.N.Y.1972). The test of secondary meaning is whether or not the effort to create it has been effective. *Carter-Wallace, Inc. v. Procter & Gamble Co.,* 434 F.2d 794 (9th Cir.1970); 1 Gilson, *Trademark Protection and Practice,*

§ 2.09[1]. Substantial sales volume of the product bearing the alleged mark, although relevant, is not dispositive, for a "large expenditure of money does not in itself create legally protectable rights." *Smith v. Chanel, Inc.,* 402 F.2d 562, 568 (9th Cir.1968).

As proof of a secondary meaning, Eagle relies on the approximately 8,000 consumer letters which I discussed earlier. As I also stated earlier, it has made no attempt to commission a survey.

■ Failure of a trademark owner to run a survey to support its claims of brand significance and/or likelihood of confusion, where it has the financial means of doing so, may give rise to the inference that the contents of the survey would be unfavorable, and may result in the court denying relief. *See Mushroom Makers, Inc. v. R.G. Barry Corp.,* 441 F.Supp. 1220, 1231 (S.D.N.Y.1980); *Springs Mills, Inc. v. Ultracashmere House, Ltd.,* 532 F.Supp. 1203, 1218, fn. 25 (S.D.N.Y.1982).

■ Eagle maintains that the correspondence they have received from consumers supports their contention of secondary meaning. In support of this, they offer the testimony of their marketing experts, Mr. Jerome Ohlsten and Dr. Sorensen. Both Mr. Ohlsten and Dr. Sorensen testified that because the letter writers capitalized the words "honey roast," or used initial capitals with respect to the "h" and the "r", or underlined both words or put them in quotation marks, this demonstrated their state of mind that they perceived "Honey Roast" to be a brand name or trademark for the product.

This evidence, however, is not probative on the issues of whether a significant portion of the consuming public has understood the term "Honey Roast" as a designation of a product emanating from a single source. As Dr. Ross testified, the set of people who wrote letters to Eagle, is not a representative sample of the relevant universe. These letters were written by persons who, in all likelihood, had a package of Eagle's product before them. Obvious-

ly, when a consumer bothers to write to a particular manufacturer to find out where they can purchase the product which is not yet in wide distribution, the consumer is going to go to great pains to make it clear to the manufacturer in his or her letter exactly which product he or she wants. Thus, the consumers use capital letters, quotation marks and underscoring. To deduce from this that the consuming public at large perceives "Honey Roast" to be a brand name is illogical. The fact that such a letter arguably underscores "Honey Roast" to refer to Eagle's nuts does not imply that users of other brands of nuts understand "Honey Roast" to designate Eagle's nuts, or that other users of Eagle's nuts have such an understanding, or even that the letter writers at some time when not communicating by letter to Eagle have such an understanding. *See Loctite Corporation v. National Starch and Chemical Corp.,* 516 F.Supp. 190, 206–207 (S.D.N.Y.1981) [5,880 consumer letters analyzed by Dr. Sorensen held not to be probative of brand awareness and secondary meaning].

Plaintiff also contends that the "fact of copying alone is sufficient to support a finding of secondary meaning, on the basis that there would be no purpose in copying a look with no associations." *Ideal Toy Corp. v. Plawner Toy Mfg. Corp.,* 215 U.S.P.Q. 610, 612 (D.N.J.1981), *aff'd as modified,* 685 F.2d 78 (3d Cir.1982).

■ Copying is, however, indicative of secondary meaning only where the trade dress copied is arbitrary and non-functional such as the coloring on prescription drug tablets, *see, e.g., Boehringer Ingelheim GmbH v. Pharmadyne Laboratories, Inc.,* 532 F.Supp. 1040, 1064 (D.N.J.1980), or the design on the outside of a "Rubik's Cube," *see Ideal Toy Corp., supra.* Where the mark is chosen because it accurately describes a product, the paramount consideration is not whether it was copied but whether policy reasons are such in the case that the descriptive words used may no longer be free for public use. There is always "the danger of depleting the general vocabulary available to all for description."

*Farm Service Inc. v. United States Steel Corp.*, 90 Idaho 570, 414 P.2d 898 (1966); *Telechron Inc., supra.* Although plaintiff has expended considerable sums of money in marketing its product, the court finds that they have not met their burden of demonstrating that "Honey Roast" is viewed by the public as designating the source of the product, "Honey Roast" or "Honey Roasted" simply designates a type of product which is marketed by a number of producers. Eagle Snacks has not shown sufficient secondary meaning for the "Honey Roast" or "Honey Roasted" term to warrant deprivation of the terms' usage for the entire snack industry. The term "Honey Roasted" is now widely used in the nut industry. While plaintiff may have been the first to market such nuts extensively, its use of the term "Honey Roast" has not been so exclusive or so extensive that it is indicative of the source of origin of the nuts.

Because I find that the descriptive mark "Honey Roast" has not acquired secondary meaning, and is therefore not a protectable mark, there is also no likelihood of confusion. Generally descriptive words may be used freely by any number of businesses in advertising directly competing products. Use of words in their descriptive sense to inform the public about the product would not confuse the public as to the source of a particular product.

Confusion in the instant case is unlikely in view of the fact that Planters honey roasted nuts are packaged and advertised prominently displaying the well-known PLANTERS and MR. PEANUT trademarks, the distinctive Planters blue and yellow trade dress and the red corner triangle Nabisco house mark. The presence of such wellknown trademarks and trade dress prominently displayed on a product may defeat a claim of likelihood of confusion, especially where the purported mark is descriptive. *See Uniroyal, Inc. v. Kinney Shoe Corp.*, 453 F.Supp. 1352, 1355 (S.D.N.Y.1978) (no likelihood of confusion between KINNEY KIDS and KEDS for footwear). Moreover, the prominent use of

the "Eagle" trademark and reference to Anheuser-Busch on all of Eagle's packaging, advertising and promotional material for the product, must be taken into account in determining whether there is a likelihood of confusion. Eagle cannot ignore the fact that it has deliberately chosen to link "Honey Roast" with the "Eagle" trademark and the Anheuser-Busch relationship, and that it has been successful in doing so.

Because plaintiff has not carried the burden of showing that either "Honey Roast" or "Honey Roasted" is a protectable trademark, I find it unlikely that plaintiff would succeed on the merits.

There is, therefore, no need to discuss whether there is irreparable harm.

Plaintiff's motion for a preliminary injunction is accordingly denied.