PARAMOUNT PICTURES
CORPORATION,
Plaintiff,

v.

DORNEY PARK COASTER COMPANY
and Zamperla, Inc., Defendants.

Civ. A. No. 88–6032.

United States District Court,
E.D. Pennsylvania.

Nov. 8, 1988.

Thomas E. Zemaitis, Pepper, Hamilton & Scheetz, Philadelphia, Pa., for plaintiff.

Joel B. Wiener, Wiener & Wiener, Allentown, Pa., for defendant Dorney Park.

Myron Cohen, Cohen, Pontani & Lieberman, New York City, for defendant Zamperla.

## MEMORANDUM

TROUTMAN, Senior District Judge.

Pending before the Court is plaintiff's motion for a preliminary injunction. Evidence in support of and in opposition to the motion was taken on September 16, 1988 with closing argument reserved until October 27, 1988. The hearing having now been concluded, the following shall constitute the Court's findings of fact and conclusions of law pursuant to Fed.R.Civ.P. 52(a).

### I. FACTS

Plaintiff Paramount Pictures Corporation, a Delaware corporation with its principal place of business in California, produces, distributes and promotes motion pictures and television programs. In May, 1986, Paramount released "TOP GUN", a motion picture it had produced. The movie purported to portray the experiences of U.S. military personnel who were selected for advanced training as fighter pilots and assigned to a U.S. naval training facility, Miramar Naval Air Station, in California. The movie "TOP GUN" features, *inter alia*, scenes of aerial "dog fights" between pilot instructors and students. One of the movie's themes involves competition among the pilots to outmaneuver and "shoot" each other down in the course of such simulated battles.

Defendant Zamperla, Inc., is a corporation incorporated and having its principal place of business in New Jersey. Zamperla sells amusement rides, recreational goods and game machines. One of Zamperla's products, the subject of this lawsuit, is a participatory ride, known as "TOP GUN", which combines the typical circular and/or vertical motion of an amusement ride with a video game. Zamperla's ride consists of a center piece with fourteen radially extending arms attached to it. At the end of each arm is a two-seat car for the riders. The arms, and, hence, the cars can be moved up and down. Each car is equipped with a video monitor and a stick which permits the rider to move the car up, down, left and right. During the ride, occupants of the cars attempt to "shoot" each other down. A car which has been "hit" is returned to ground level for one revolution. The ride ends with a "shoot out" among the participants until only one car remains.

In November, 1987, at a trade show in New Orleans, Zamperla sold one such ride to Dorney Park Coaster Company, a Delaware corporation which maintains its principal place of business, the operation of an amusement park, in Allentown, Pennsylvania. The ride was installed in time for the 1988 summer season at Dorney Park, and it thus became the only amusement park in the United States to operate a ride of this type.

As the result of a letter received from a Dorney Park employee in June, 1988, Para-

mount became aware of the Top Gun ride and addressed letters to both Zamperla and Dorney demanding that they cease and desist from using the name Top Gun and a design on the center portion of the ride, as installed at Dorney Park, which Paramount characterized as a copy of the distinctive logo developed in connection with the movie and included on various goods distributed by Paramount licensees.

Paramount subsequently filed suit against Dorney and Zamperla and moved for a preliminary injunction. Paramount's claims are based upon 15 U.S.C. § 1125(a), a portion of the trademark laws which prohibits a false designation of the origin of goods or services and is, in effect, the federal statutory counterpart to common law actions for unfair competition. In addition, Paramount has asserted a claim under the copyright laws, 17 U.S.C. § 101, *et seq.* and pendent state law claims under the statutory and common law of Pennsylvania for trademark infringement, unfair competition and dilution.

At or prior to the September hearing on the motion, certain agreements were reached between the parties. Dorney agreed alter the design on the center of the ride for the remainder of its 1988 season. Later, Dorney and Paramount reached an agreement which will eliminate Dorney as a defendant in this action, rendering moot the present motion as it relates to Dorney.

Prior *to* closing arguments, it was the Court's understanding that Zamperla had also agreed not to employ the disputed design on any additional rides which it might sell. During the argument, however, Paramount's counsel asserted that Zamperla is planning to display the ride at an upcoming trade fair exactly as it had been installed at Dorney, including both name and design. Zamperla's counsel denied that the defendant would use the design to which Paramount objects. For present purposes, we do not find it necessary to consider and resolve this tangential issue. Consequently, the dispute has been narrowed. The only issue before the Court for resolution is whether Zamperla is permitted to retain the name Top Gun, with or

without lighted stripes on both sides of the words, for said amusement ride pending final hearing on the matter.

## II. DISCUSSION

In order to establish its entitlement to a preliminary injunction, Paramount must demonstrate a likelihood of success on the merits and irreparable injury if the Court refuses to enter a preliminary injunction. In addition, the Court is required to consider and balance the harm to the defendant if the plaintiff is granted a preliminary injunction and to also determine whether the public interest will be better served by the grant or the denial of the motion. *Eagle Snacks, Inc. v. Nabisco Brands, Inc.,* 625 F.Supp. 571 (D.N.J.1985). We will first consider the question of the plaintiff's likelihood of success on its unfair competition claims.

### A. Likelihood of success

While Paramount does not have a registered trademark in the name Top Gun, it contends that through its efforts and expenditures in advertising and promoting the movie, the public has come to associate the words Top Gun with the movie. Paramount further contends that Zamperla's use of the same name to designate a ride similar in concept to one of the movie's themes is an attempt to trade on and benefit from Paramount's product.

Zamperla contends that the name Top Gun is, at best, a descriptive term which had been used long before Paramount's movie to designate the best in a field of endeavor. And, more recently, the naval training facility at Miramar. Thus, Zamperla argues that Paramount cannot have acquired protectable rights in the name.

### 1. SECONDARY MEANING

■ Under the statutory and the common law of unfair competition, an unregistered, descriptive mark is protectable if, through the efforts of the plaintiff, the mark has achieved secondary meaning, *i.e.,* the public perceives the mark to be a designation of the origin of the product. *Scott Paper Co. v. Scott's Liquid Gold, Inc.,* 589

F.2d 1225 (3d Cir.1978). To establish secondary meaning, Paramount is required to show that the public associates the words Top Gun with its motion picture, thereby suggesting to the public that products bearing the same name emanated from a single source. *Id.* The purpose of providing trademark protection to those who have sufficiently developed such secondary meaning is to protect the public from confusion with respect to the origin of products or services. A finding that a mark has achieved secondary meaning is usually based upon evidence of extensive advertising, as well as evidence of revenues received by the holder of the mark through sales of goods to which it has been affixed. *Id., Universal City Studios, Inc. v. Montgomery Ward & Co., Inc.,* 207 U.S. P.Q. 852 (N.D.Ill.1980).

Evidence adduced by Paramount at the September hearing showed that Paramount spent over fourteen (14) million dollars to advertise "Top Gun" nationally through all available media outlets (television, radio, newspapers and magazines) prior to and for several months subsequent to its release to movie theatres. (Plaintiff's Exh. 3). Additional expenditures totaling almost three (3) million dollars were made to promote the videocassette of the movie when that was released for home viewing. (Plaintiff's Exh. 4). Moreover, Paramount also pro-produced evidence of the effectiveness of the advertising campaign which showed that the television advertising alone reached an overwhelming majority of households with television reception. (Plaintiff's Exh. 3 & 4). Further proof of the public's knowledge of the film is its success in the market. For example, after 72 days of release to movie theatres around the country, the film had grossed over 100 million dollars. (Plaintiff's Exh. 2). As of January, 1988, *Variety* magazine listed "Top Gun" as the twentieth "All Time Rental Champion Film" with 79,400,-000 dollars worth of total rentals. (Plaintiff's Exh. 1).

In addition to evidence of promotion of the film itself, Paramount has produced evidence of an extensive and successful licensing program through which the purveyors of various goods purchased from Paramount the right to affix the name Top Gun to their products along with distinctive art work associated with the movie and/or pictures of actors appearing therein. The licensees are also permitted to promote and exploit the connection to Paramount's movie. Among those licensed products are video games for arcades, home video game systems and home computers. (*See, generally,* testimony of Maggie Young and exhibits pertaining thereto).

Defendant Zamperla countered this evidence by producing testimony as well as documentary and demonstrative evidence, of third party uses of the term "top gun" prior to and since the movie's release. Zamperla argues that this evidence precludes protection of the name Top Gun on behalf of Paramount because it demonstrates that Paramount was not the first and exclusive user of the mark.

This argument as to the significance of prior third party use of a claimed mark is somewhat puzzling and unconvincing in light of the absence of any mention of this requirement in any case which relates specifically to the unfair competition provision of the Lanham Act (15 U.S.C. § 1125(a)), the only section of the federal statute upon which plaintiff relies. Although nothing in either defendant's arguments or the case-law relating to the Unfair Competition statute so suggests, it may be that if a defendant is able to prove that a prior user of the same mark had already established a secondary meaning for it, it would be difficult or impossible for a later user to do so. While we do not suggest that this proposition is actually the law, we discuss the issue merely to give due consideration to the possibility that defendant's argument has some application to this case.

Even if this were a legally acceptable proposition, its success would depend upon the production of sufficient evidence from which the Court could find that another user or users had developed a secondary meaning with respect to the mark before the plaintiff entered the scene. Such evidence is utterly lacking here. Conceding

that Top Gun was well known to a very *limited* segment of the population as the common nickname of the Miramar facility prior to the movie, there is no evidence that the existence of the facility or its name were *widely* known prior to said movie. To the extent that there is *now* an association in the mind of the public between the words Top Gun and the Miramar facility, the evidence establishes that it occurred through and as a result of Paramount's promotional efforts.

The only other possible significance of the evidence of third-party use of the words "top gun", whether prior or subsequent to the movie, is in connection with Zamperla's assertion that Top Gun is a "weak" mark, not entitled to protection in connection with amusement rides. The evidence and the arguments relating thereto will be considered in that context.

Likewise, we find no support for Zamperla's argument that the term "top gun" is so "hopelessly descriptive" of the contents of the movie that it is incapable of acquiring secondary meaning. In the first instance, the argument does not comport with the four accepted categories of designations of origin as set forth by the court in *A.J. Canfield Co. v. Honickman*, 808 F.2d 291 (3d Cir.1986). Noting that an unregistered trademark is unprotectable only if the public recognizes it as identifying or designating a source of origin and distinguishing the goods and services bearing the mark from those of others, the court went on to explain that,

> Such identification depends, in the first instance, on a designation's level of inherent distinctiveness, and for this purpose, courts have divided designations into four categories: arbitrary (or fanciful) terms, which bear "no logical or suggestive relation to the actual characteristics of the goods;" suggestive terms, which suggest rather than describe the characteristics of the goods; descriptive terms, which describe a characteristic or ingredient of the article to which it refers, and generic terms, which function as the common descriptive name of a product class.

808 F.2d at 296 (citation omitted). The court went on to describe the level of protection accorded each category, noting that arbitrary and suggestive marks are automatically protected, while a generic mark is never protectable. As noted previously, a descriptive mark may be protected if a plaintiff succeeds in establishing that mark has acquired secondary meaning.

There is no category, in *Honickman* or elsewhere, for "hopelessly descriptive" marks. We can only assume, therefore, that Zamperla means to assert that the term "top gun" is generic if indeed Zamperla really intends to argue that the title is unprotectable as a matter of law. We repeat that the evidence produced by the defendant simply does not support the proposition that even that segment of the public already familiar with the Miramar training facility immediately understood that the movie entitled "TOP GUN" was meant to portray the school.

Consequently, we find that the title "TOP GUN" is, at least, descriptive and that Paramount has developed secondary meaning for the name "top gun". Although defendant produced evidence of other uses of the term prior to the movie, specifically with respect to the naval training facility described in the movie, the circumscribed and sporadic instances of "advertising" of the Miramar facility through air shows, catalog offerings of facsimiles of equipment and insignia, such evidence is not sufficient to show more than minimal impact upon the public consciousness.

## 2. LIKELIHOOD OF CONFUSION

■ In addition to proving that the words Top Gun have acquired secondary meaning, Paramount must also prove that there is a likelihood of confusing the public if Zamperla is permitted to continue using the name. To establish likelihood of confusion in the context of this case, Paramount must demonstrate that consumers exposed to Top Gun as the name of a ride in an amusement park are likely to associate the ride with Paramount's movie of the same name. *Scott Paper Co. v. Scott's Liquid*

*Gold.*[1] It is not necessary to prove that consumers would identify Paramount as the source of both the movie and the ride, merely that consumers are likely to assume that the ride is sponsored by or affiliated with the source of the movie. *Universal City Studios, Inc. v. Montgomery Ward & Co., Inc.*, 207 U.S.P.Q. 852 (N.D.Ill.1980).

In *Scott*, the court enumerated ten factors to consider in determining whether the plaintiff has succeeded in proving likelihood of confusion. Following that precedent, we now evaluate the evidence produced at the hearing in light of these factors.

1) *Degree of similarity between Paramount's claimed mark and Zamperla's allegedly infringing mark.*

■ Paramount seeks protection for both the words Top Gun and the logo which accompanies the words on licensed goods and advertising and promotional materials. Obviously, since the title of the movie and the ride are identical, this supports Paramount's claim insofar as it concerns the words alone.

As noted earlier, there are competing arguments as to what Zamperla is planning to do with respect to the logo. The ride sold to Dorney Park was accompanied by

lighted stripes on both sides of the words, a design very similar to Paramount's logo. Since Zamperla represents that this design has been changed and will not appear on any other exemplar of the ride, there is a somewhat diminished contribution to confusion.

Nevertheless, because the mark is identical both visually and aurally, we find that this factor strongly supports Paramount's claim on the likelihood of confusion issue.

2) *Strength of Paramount's mark.*

Contrary to Zamperla's arguments, we find that Paramount has developed a strong secondary meaning for the term Top Gun. It is here, however, that Zamperla's argument relating to third-party uses of the term Top Gun is most relevant. As noted by the court in *Chips 'N' Twigs v. Chip-Chip, Ltd.*, 414 F.Supp. 1003, 1017 (E.D.Pa.1976), "[T]hird party use of similar marks is relevant on the question of likelihood of confusion between plaintiff's and defendant's marks [in that] 'The greater the number of identical or more or less similar trademarks already in use on different kinds of goods, the less is the likelihood of confusion'." While in *Chips 'N' Twigs*, the court was referring specifically to prior

**1.** Zamperla argues that there can be no likelihood of confusion with its ride because Paramount is attempting to prohibit the use of Top Gun on a product to which neither Paramount itself, nor any of its licensees, has applied the name. Therefore, we shall consider whether this is a case in which the Court must determine whether it is appropriate to extend trademark protection into a non-competing market.

That issue was discussed in *Scott*, where the court cited two possible reasons which justify an extension of trademark protection into a non-competing market: the extent to which the plaintiff's reputation may be damaged if the defendant were permitted to retain the mark for its product and whether, in adopting the mark, the defendant was attempting to benefit from goodwill developed by the plaintiff. The presence of either factor would support protection of the plaintiff's mark in a non-competing market. *Scott*, 529 F.2d at 1228.

The court noted, however, that the ultimate decision to extend such protection turned on whether the plaintiff had developed a secondary meaning for the mark in goods and services to which the mark had not been applied, as Zamperla here contends the plaintiff is attempting to do. Unfortunately, without providing any guid-

ance as to the quantum or quality of evidence which would sustain such a finding, the court held that the district court had failed to substantiate its conclusion that the plaintiff was entitled to protection in a non-competing market. Indeed, the circuit court gave no guidance as to how to determine whether the plaintiff is actually seeking protection in a non-competing market.

In *Scott* it was comparatively simple, conceptually, to separate the market for paper goods from the market for household cleaning solutions and to conclude that those markets are distinct. The situation here involved is more complex. Both plaintiff and defendant are supplying entertainment services, although they do not have identical vehicles for delivering their wares. Thus, we conclude that we do not here face the same issue of non-competing markets addressed by the *Scott* court. To the extent that there is an issue relating to the fact that Paramount has not produced or licensed an amusement park ride, we conclude that it is an issue more properly considered in connection with the issue of likelihood of confusion rather than in connection with the issue of secondary meaning.

trademark registrations, the principle involved is equally applicable to the situation here present, where defendant has argued vigorously that the naval training facility is nicknamed Top Gun and is regularly and consistently referred to as such by naval personnel, as well as by authors who wrote about it for various publications. In addition, defendant stressed that there was an earlier movie with the same title, although its subject matter was quite different from fighter jet pilots and their training. Finally, defendant also brought to the Court's attention the fairly common colloquial use of the term to designate the best, the most successful aspirant to a position, etc.[2]

There was no attempt made, however, to quantify these uses or to demonstrate in any other way the extent of public familiarity with any use of "top gun" prior to and/or apart from Paramount's promotional and licensing efforts. Defendant's evidence was simply that such other uses occurred.

In contrast, Paramount presented extensive evidence of not only its efforts to connect the term with its movie, but also of its success, as noted previously. Thus, we conclude, as did the *Chips 'N' Twigs* court, that the fact of third-party uses of the term provides no basis for concluding that such uses had any impact upon the public so as to diminish the strong secondary meaning developed by Paramount and demonstrated at the hearing on this motion. The strength of the Top Gun mark here exacerbates the likelihood of confusion if defendant is permitted to use the same mark. The greater Paramount's success in injecting the mark into public consciousness and the less the public is aware of other possible sources of the term Top Gun, the more likely it is that the public will assume a connection with the movie when they see the mark affixed to a product.

3) *Price of the goods as indicative of the care and attention expected of consumers.*

At first blush, this factor appears to have no relevance to this case in that no member of the general public is likely to purchase and install an amusement ride. Consumers do, however, purchase rides thereon and, presumably, decide which amusement parks to patronize depending, at least to some extent, on the rides available. On these terms, it is possible to compare the prices of a movie theatre admission, videotape rental and many classes of licensed goods with costs of admission to an amusement park or to the ride itself and to conclude that these are roughly comparable. Thus, this factor also supports plaintiff's position that likelihood of confusion exists.

4) *Length of time defendant has used the mark without actual confusion.*

The evidence established that an employee of Dorney Park, with no connection to the plaintiff, assumed that the public would connect the ride at Dorney with the movie and, knowing that there was no sponsorship of the ride by Paramount, notified it of Dorney's use of the name. (*See,* Plaintiff's Exh. 43) Likewise, during the few months that the ride was in operation at Dorney, the park received four letters from which it can be inferred that the writers, although never having seen the ride, assumed that its theme was a modern warfare shoot-out, an underlying theme of the movie. (*See,* Plaintiff's Exh. 68). Thus, the evidence reveals that, virtually as soon as the ride was in operation, there was confusion.

5) *Intent of the defendant in adopting the mark.*

There is little evidence from which the Court can glean Zamperla's intent in choosing the name Top Gun for its ride. Due to the busy schedules of Zamperla's principals, defendant did not call any of them to testify at the hearing. Consequently, the only evidence of intent from those sources comes in the form of the sworn declaration of Alberto Zamperla. He stated that the

---

**2.** Interestingly, a review of dictionary entries revealed listings for "top banana", "top dog" and "top flight" but no listing for "top gun". WEB-STER'S 3RD NEW INTERNATIONAL DICTIONARY, (unabridged) p. 2410 (16th ed. 1971).

name Top Gun was suggested to him by a friend, Claudio Festa, an employee at a NATO air base, who was familiar with the Top Gun school. According to Zamperla, Festa's suggestion was prompted by Zamperla's description of the ride, specifically the determination of a single winner, the "top gun", at the conclusion of the ride. (Zamperla Declaration, ¶ 22). The conversation took place during the spring of 1987, approximately a year after the Paramount movie was released.

If this portion of the declaration is meant to suggest that Festa's familiarity with procedures at the Miramar facility prompted his suggestion to Zamperla, the declaration contradicts the testimony of one of defendant's witnesses at the hearing. Alan Mullen, a former pilot instructor at the Top Gun school, testified that while some parts of the movie were accurate, the competition theme was not. At the school, according to Mullen, cooperation is stressed and no student or instructor is designated the "top gun".

To the extent that Zamperla's understanding of the origin of Festa's suggestion conflicts with Mullen's testimony, the Court credits the testimony of Mullen, whose familiarity with the Miramar facility was well established. Moreover, we have already noted the extensive evidence in the record of Paramount's far-reaching and intensive advertising of the movie. We conclude, therefore, that if Festa was reminded of the naval training facility when Zamperla's ride was described to him, the origin of that reminder was more likely than not the movie rather than his knowledge of the Miramar facility.

It is possible, of course, that Zamperla was innocently misled by his friend. Other evidence, however, suggests that Zamperla had some awareness that adopting the name Top Gun posed a potential problem. He sought to determine the availability of the name Top Gun for an amusement ride before adopting it by requesting an opinion from counsel as to the likelihood that it could lawfully be used for an amusement ride. (Zamperla Declaration, ¶ 24; Plaintiff's Exh. 63). As evidence of intent, this

fact can, of course, cut both ways. While it suggests that defendant did not intend to infringe an existing mark and might have reconsidered using it upon an unfavorable response from counsel, it also suggests that he may have been aware of a reason for caution. From the evidence of Paramount's intensive efforts to publicize the movie, the similarity of the ride to one of the movie's themes but not to what occurs at the school itself, we infer that any such awareness of a need to proceed cautiously could very likely have been prompted by knowledge of the existence of the movie.

Finally, we reach an ultimate inference of intent, based not only upon the foregoing, but upon several additional supporting facts and inferences therefrom. For example, although Zamperla stated that he was not aware of the name Top Gun before the spring of 1987, defendant did not sell a ride bearing that name until the fall of 1987. Also, Zamperla declared that, "The cars on the ride represent space cars. A space motif including satellites and planets also forms the background on the video screens." (Zamperla declaration, ¶ 25). Since the original telecombat concept of Zamperla's ride had nothing to do with U.S. navy fighter pilot training and that training, in turn, has nothing to do with competition among the trainees and their instructors, there is no logical reason for Zamperla to have adopted the naval training facility's nickname for the ride absent knowledge of the movie. Moreover, since we have already found that Paramount mounted an extensive advertising campaign to make the movie, including its pilot competition theme, and had advertised the movie in Italy prior to the defendant's naming of the ride (See, plaintiff's Exh. 57), we conclude that there is a strong inference that defendant knew that the name was likely to attract customers to amusement parks to patronize the ride. Thus, we likewise find an intent on Zamperla's part to trade on the name "Top Gun", well-known and popularized by Paramount.

6) *Evidence of actual confusion.*

While we do not find the evidence relating to this factor as compelling as Para-

mount contends, there is one letter among the four designated as Plaintiff's Exh. 68 which refers to Hollywood exploitation of war-like tendencies. This is strongly suggestive of a connection between the movie and the ride in the writer's mind. Likewise, the other letters reflect a connection in those writers' minds with the theme of the movie. This inference is reinforced by the Zamperla statement regarding the space motif of the ride. It is doubtful that, without knowledge of the movie, the members of the clergy and peace groups who wrote to Dorney would have assume that the ride purported to be a combat simulator intended to symbolize a dogfight between American and Soviet pilots, which is not, according to Zamperla's declaration and the pictures in evidence (Plaintiff's Exh. 76), suggested by the motif of the ride itself.

In the absence of any evidence that the writers of the four letters contained in Plaintiff's Exh. 68 were familiar with the Top Gun school itself, we find and conclude, on the record before us, that their assumptions and beliefs as to the theme of the ride, and their objections thereto, arose from and were based upon their knowledge of Paramount's movie rather than from another source. Consequently, we also find and conclude that upon hearing that the name of the ride at Dorney was Top Gun, the writers assumed and believed it had an earth rather than space war theme and based upon that assumption and belief concluded that its theme was taken from the movie, thus demonstrating actual confusion.

7) *Whether the goods are marketed through the same channels of trade and marketed through the same media.*

8) *The extent to which the parties' sales efforts are the same.*

These factors are not entirely relevant to the present case, since the purchasers of movie tickets, video rentals and licensed goods are not likely to purchase amusement rides. They are, however, conceptually the same as the price factor, *i.e.*, although the actual purchasers of the ride are not in the same market as Paramount and are not specifically targeted by Paramount's advertising, amusement park customers and customers of the goods offered for sale by Paramount and its licensees are in the same market. Those consumers purchase entertainment services and goods relating thereto. Both Paramount and amusement parks advertise their wares extensively to those consumers, who are most likely to be younger members of the public.

9) *Relationship of the goods in the public mind because of similarity of function*

10) *Other facts which suggest that the consuming public might expect the prior owner to produce a product in the defendant's market.*

The greatest similarity between the movie itself and the ride is that both are entertainment vehicles. Nevertheless, the evidence relating to these final two factors likewise contributes to establishing likelihood of confusion.

In the first instance, Paramount has produced evidence of an extensive and wide-ranging licensing program which covers many entertainment functions, such as model kits, posters and games, including an arcade video game, a home video system game and a game for use on several popular home computers. It is likely, therefore, that consumers, aware of the movie and of the available video games, would assume that an amusement ride with the same name as the movie and with a video game component would be connected with the source of the movie, particularly since video games based on the movie but without the ride component are available from Paramount licensees. It is reasonable to assume that Paramount would be involved in all conceivable variations on the video game, particularly since it was involved in the three variations of those entertainment goods which were available prior to Zamperla's amusement ride.

The foregoing analysis supports the Court's conclusion that Paramount has established the second element of its unfair

competition claims, a likelihood of confusion between its use of Top Gun and defendant's use thereof. Therefore, convinced, as we are, of Paramount's likelihood of success on the merits of one class of its claims,[3] which is sufficient to support a preliminary injunction, it follows that if the additional considerations necessary to granting that remedy are ultimately established, plaintiff's motion should be granted. We thus find it unnecessary to consider Paramount's additional claims at this time.

## B. Irreparable Harm

■ Courts have consistently concluded that irreparable harm follows from a likelihood of success on an unfair competition claim. *See, e.g., Chips 'N' Twigs v. Chip-Chip, Ltd., Universal Studios, Inc. v. Kamar Industries, Inc., Universal City Studios, Inc. v. Montgomery Ward & Co., Inc., Universal City Studios, Inc. v. Mueller Chemical Co., Inc.,* No. 81 C 5737 slip op. at 10 (N.D.Ill. Nov. 24, 1982). The reason consistently cited for such a conclusion is the plaintiff's inability to exercise control over the products to which the mark publicized by the plaintiff will be affixed by the unauthorized user. Negative contacts by the consuming public with products not authorized by the legitimate user of the mark could harm the goodwill generated by the plaintiff's efforts to promote products bearing the mark.

Moreover, the evidence here establishes that plaintiff has an extensive licensing program through which Paramount exercises stringent control over use of the Top Gun name, both for its own benefit and the benefit of all licensees. To allow unauthorized use of the name to continue will have an incalculable effect on the relationship between Paramount and those licensees, which may well reach beyond the present dispute. If this defendant may continue to use Top Gun to designate its product without the scrutiny and payment of fees to which licensees are subject, the desirability of obtaining a license, whether for use of

Top Gun or another Paramount-developed designation, is greatly diminished.

Consequently, we join those courts which have concluded that unauthorized use of another's trademark, whether or not it is a registered mark, subjects the owner of the mark to irreparable harm incapable of redress by the payment of damages alone.

## C. Balance of Harms

■ Defendant argued vigorously that entry of a preliminary injunction will be more detrimental to it than failure to grant the motion will be detrimental to the plaintiff. Zamperla is planning to display the ride bearing the disputed name at a trade show in mid-November at which it expects to sell three rides at most. If a preliminary injunction is entered before then, defendant will be put to the expense of changing both the name of the ride on the exemplar to be displayed and in whatever written promotional material may be offered to potential purchasers. While this will undoubtedly inconvenience the defendant, we do not consider this to be an actual "harm" to Zamperla. The costs incurred for such alterations are readily compensable in damages if the injunction is improvidently entered.

Of greater concern, however, is Zamperla's assertion that a preliminary injunction against the use of the name Top Gun will, as a practical matter, foreclose its future use of the name. This is so because once the ride has been marketed under a different name, it will cause greater confusion and difficulties for Zamperla, as well as for purchasers of the ride and potential purchasers thereof, to rename it again. It will, at that point, be better to simply retain whatever different name is chosen before the upcoming trade show.

The Court sought to give due consideration to this potential harm by undertaking a comprehensive assessment of the evidence and analysis of the law supporting plaintiff's claim on at least one theory of liability, unfair competition. We are confi-

---

**3.** We note that plaintiff's common-law claim for unfair competition is likewise established based upon our conclusion that plaintiff is likely to be successful on its claim under § 1125(a). *Eagle Snacks, Inc. v. Nabisco Brands, Inc.,* 625 F.Supp. 571 (D.N.J.).

dent that the ultimate decision of this Court will confirm our initial determination that plaintiff has a strong likelihood of prevailing on at least this claim, which is sufficient to support permanent as well as preliminary injunctive relief. Our conclusion that plaintiff will ultimately prevail removes from Zamperla any claim of "harm" relating to having to rename its product. If it is not entitled to use the name Top Gun because doing so constitutes unfair competition, there is no reason whatsoever to allow the defendant to continue to benefit from the high degree of recognition and positive impact which is now attached to Top Gun as a result of plaintiff's efforts.

We recognize that defendant has taken the position, at closing argument on the present motion, that it has not yet had its day in court. Presumably, defendant is referring to the limited evidence presented on its behalf at the hearing. For instance, as noted previously, none of defendant's principals appeared at the hearing to testify.

On this issue, the Court is unimpressed. The complaint was filed early in August, accompanied by plaintiff's motions for a preliminary injunction and expedited discovery. Defendant knew then that the trade show was looming and that plaintiff was pressing for a decision before Zamperla could market its ride there under the name Top Gun. Moreover, plaintiff had previously, several weeks before filing the complaint, sent Zamperla a cease and desist letter from which Zamperla had initial notice of Paramount's claims.

The Court scheduled a meeting with counsel, at counsel's earliest convenience, to see if there was any possibility of amicably resolving any of the issues, knowing that plaintiff's request for an early hearing would be a hardship for defendant. At the first conference, the Court sought to accommodate all positions insofar as possible, attempting to set a reasonable discovery and hearing schedule. The Court offered virtually any date for a hearing and also offered to postpone a preliminary hearing in favor of a somewhat delayed but more comprehensive final hearing. Since defendant's counsel could not be sure of being adequately prepared for such a hearing in time to allow for a decision by mid-November and plaintiff was not willing to postpone a preliminary decision unless defendant agreed to stop using the name Top Gun pending a final decision on the merits, this suggestion went nowhere.

After more conferences and motions, the preliminary hearing was finally scheduled for September 16, more than six weeks after the complaint was filed and four weeks after the initial meeting with counsel. Testimony concluded in one exceptionally long day, with final argument postponed until a later, unspecified date. At no time, either before the day testimony was taken or during the four additional weeks which passed before final argument was held, was there any request from defendant to hold the record open in order produce additional evidence.

As the time before the trade show grew short, the Court scheduled final argument, knowing that plaintiff would have been satisfied to proceed to a decision without argument while defendant wanted the opportunity to present closing argument. Accordingly, argument was scheduled upon nearly two weeks notice to counsel, notwithstanding the time pressures that this schedule placed upon the Court. It then developed that defendant expected to have ten days after receiving the transcript of the hearing in which to prepare proposed findings of fact and conclusions of law and to otherwise prepare for final argument. While that may not, at first, seem unreasonable, a check of Court records revealed that it was plaintiff, not defendant, who had ordered the transcript in the first instance. Transcripts are readily available on a normal, thirty day basis or an expedited basis. A telephone call to the clerk's office would provide all necessary information for obtaining the transcript. It is inconceivable to the Court that a transcript deemed important enough to warrant requesting a delay in the proceedings until such time as it was received was not even ordered by the very party who deemed it essential for

its preparation of final submissions to the Court.

Had we acceded to defendant's requested timetable, there would have been no possibility of reaching a decision before mid-November as requested.

If defendant did not have its "day in court", it is only because it failed or refused to cooperate in establishing an early hearing date, as requested. The Court afforded defendant ample accommodation in an attempt to ease the burdens it faced as a result of plaintiff's request for an early decision. Any resulting hardship must be attributed to the defendant.

### D. Public Interest

As other courts have noted, the entire *raison d'etre* for regulating use of either registered trademarks or unregistered trademarks, by means of the unfair competition provision of the trademark statute, is to protect the public from confusion as to the origin and source of products offered for sale. *See, Scott Paper Co. v. Scott's Liquid Gold,* 589 F.2d at 1229, quoting *James Burrough, Ltd. v. Sign of the Beefeater, Inc.,* 540 F.2d 266, 276 (7th Cir. 1976). Consequently, our conclusion that plaintiff has established its entitlement to claim Top Gun as its trademark, by means of sufficient showings of both secondary meaning and likelihood of confusion, leads ineluctably to the conclusion that a preliminary injunction will serve the public interest by eliminating the confusion likely to occur as to the source of a ride designated Top Gun but having no connection to plaintiff's movie.

We realize that only a limited segment of the public, *viz.,* those who purchase rides for installation at amusement parks, is likely to be exposed to the infringing mark before next spring, at the earliest. Presumably, then, there would be time for a final hearing before the general public is so exposed. Thus, the public interest in preliminary relief appears to be somewhat reduced. Nevertheless, we conclude that both that limited segment's interests and those of the general public are better served by granting the preliminary injunction. It is likely those who will spend the considerable sums needed to purchase amusement rides for next summer's season will consider all aspects of a ride's merit, including its name. Those purchasers are entitled to evaluate defendant's product solely on attributes other than the attractiveness of a name which they may not actually be able to use. Similarly, the interests of potential patrons of the parks purchasing rides this fall will be better served if this ride is chosen on those bases.

### III. AFFIRMATIVE DEFENSE

■ Defendant's final argument in opposition to plaintiff's motion for a preliminary injunction is the assertion that plaintiff is not entitled to equitable relief because of "unclean hands". This contention is based upon Paramount's application for trademark registration for caps and tee-shirts. (Plaintiff's Exh. 59). The application sought to register the Top Gun name, written in the block letters and surrounded by the graphics which appear in the title frame of the movie, as well as on all advertising and promotional materials and licensed products. Defendant argues that the declaration in the application that Paramount knew of no other entity having the right to use that mark in interstate commerce such that allowing registration of Paramount's mark would be likely to cause confusion constitutes perjury. Zamperla argues that Paramount knew that hats and tee shirts offered for sale at the Miramar facility also bear the name Top Gun, rendering Paramount's statement untrue.

We find this defense unpersuasive for several reasons. First, we fail to see any connection between this case, based upon unfair competition resulting from defendant's unauthorized use of an unregistered mark, and the contents of a trademark registration application. We are not here concerned with granting or denying trademark registration. If that issue were involved, the contents of a registration application might well be relevant with respect to a challenge to the trademark registration. Second, defendant's argument is without substantive merit. The mark for

which registration was sought was not the name Top Gun alone. Rather, the mark described in the application clearly included the distinctive artwork, *i.e.*, the drawing of the jet plane above the letters, the five-point star beneath the letters and the banding surrounding and incorporated in the lettering. The entirety of this mark is quite dissimilar from the way the words Top Gun appear on examples of the shirts and caps sold at the Miramar station. (*See, e.g.,* Defendant's Exh. 105, 107, 108, 110). Finally, Paramount's statement in the application did not assert that the words Top Gun were not, to its knowledge, used on similar goods sold in interstate commerce. Rather, the substance of Paramount's statement was that no other entity had the right to use an identical mark or one so closely similar as to cause confusion or to deceive. As noted, our comparison of the words as used on articles sold at Miramar and the mark for which Paramount applied for registration lead us to conclude that the statement is true on its face. Even if our conclusion were otherwise, however, it would be difficult to conclude that plaintiff perjured itself as a result of the disputed statement. The assertion is as much an opinion as it is a statement of fact. Perhaps to Zamperla the use of the words by both Paramount and the Navy are confusingly similar, but that, too is an opinion, not an established and uncontrovertible fact.

## IV. CONCLUSIONS

The court has jurisdiction of this dispute under 28 U.S.C. §§ 1331 and 1338. Plaintiff has sufficiently established that it is entitled to a preliminary injunction with respect to its claim arising under the Unfair Competition provision of the Lanham Act, 15 U.S.C. § 1125(a). Paramount produced extensive evidence to support its contention that it has developed secondary meaning for the name Top Gun as applied to entertainment and/or amusement products. Paramount has also established, to the Court's satisfaction, that there is a likelihood of confusion in the public as to the origin and/or sponsorship of Zamperla's amusement ride. We conclude that the public is likely to perceive the ride to have emanated from the same source as the movie "Top Gun", produced by plaintiff Paramount. Consequently, the Court holds that plaintiff has shown a strong likelihood of success on the merits of its unfair competition claims under both federal and state law, the latter being subject to the same factual and legal standards as plaintiff's claim under the federal statute. Likewise, the Court carefully considered the additional elements necessary to properly support a preliminary injunction and finds that plaintiff will suffer irreparable harm without a preliminary injunction, that the harm which defendant may suffer as a result of the entry of a preliminary injunction is *de minimis* in comparison to the harm which the plaintiff could be expected to suffer if the Court fails to enter a preliminary injunction and that the public interest will be best served if the injunction is granted. In addition, the Court considered defendant's affirmative defense and finds it to be without merit.

Thus, by accompanying order, the Court will grant plaintiff's motion for a preliminary injunction against defendant Zamperla's use of the name Top Gun and/or the distinctive artwork, or any parts or confusingly similar versions thereof, which accompanies Paramount's visual presentation of the words Top Gun.

## ORDER

AND NOW, this 8th day of November, 1988, upon consideration of plaintiff's motion for a preliminary injunction and defendant's response thereto, IT IS ORDERED that plaintiff's motion is GRANTED.

Defendant Zamperla, Inc., together with its officers, directors, agents, employees, successors, assigns and all those controlled by them, or in active concert or participation with them are, until further order of this Court, ENJOINED

(1) From reproducing, copying, colorably imitating or otherwise using in any way in connection with defendant's business or

services, Paramount's "Top Gun" trademark;

(2) From using in any way in connection with its business or services any other name, artwork, logo or trademark so similar to Paramount's trademarks as to be likely to cause confusion, to cause mistake or to deceive;

(3) From using, licensing or authorizing others to use Paramount's trademarks in any manner which suggests an association with or sponsorship by Paramount;

(4) From misappropriating Paramount's trademarks;

(5) From trading on Paramount's name and mark, reputation and goodwill;

(6) From passing off defendant's services as those of Paramount;

(7) From injuring Paramount's business reputation and otherwise unfairly competing, directly or indirectly, with Paramount.