921 F.2d 467
 17 U.S.P.Q.2d 1104
 CHARLES JACQUIN ET CIE, INC., Appellant/Cross-Appellee
v.
DESTILERIA SERRALLES, INC., Crown Marketing International
and Howrene Wine & Spirit Inc.
Destileria Serralles, Inc. and Crown Marketing
International, Appellees/Cross-Appellants.
 Nos. 90-1213, 90-1234.
 United States Court of Appeals,
Third Circuit.
 Argued Aug. 31, 1990.
Decided Dec. 13, 1990.
 
 1
 Arthur H. Seidel, Stephen J. Meyers (argued), Nancy Rubner-Frandsen, Seidel, Gonda, Lavorgna & Monaco, Philadelphia, Pa., for appellant/cross appellee.
 
 
 2
 Martin F. Savitzky, William H. Elliott, Jr., Synnestvedt & Lechner, Philadelphia, Pa., Albert Robin (argued), Robin, Blecker, Daley & Driscoll, New York City, for appellees/cross appellants.
 
 
 3
 Before HUTCHINSON, NYGAARD and ROSENN, Circuit Judges
 
 OPINION OF THE COURT
 NYGAARD, Circuit Judge
 
 4
 In this Lanham Act case, appellant Charles Jacquin Et Cie, Inc. ("Jacquin") alleged that Destileria Serralles, Inc. ("DSI") and Crown Marketing International ("Crown") infringed on its products' trade dress in violation of 15 U.S.C. Sec. 1125(a) and state common law. The district court directed a verdict in favor of DSI and Crown on Jacquin's compensatory and punitive damages claim 730 F.Supp. 662. The jury found that Jacquin's trade dress had acquired secondary meaning and that there was a likelihood of confusion with DSI's trade dress, and the district court crafted injunctive relief to protect Jacquin. Jacquin appeals the scope of that injunction and the district court's directed verdict on punitive damages. We will affirm in part and reverse and remand in part.I.
 
 
 5
 Jacquin, a Pennsylvania corporation, produces alcoholic beverages, including cordials. DSI, a Puerto Rican corporation, produces rum and rum schnapps. Crown was a Florida partnership which distributed DSI's products in the continental United States. At the time of trial, Crown was no longer in business.[1]
 
 
 6
 In 1968 Jacquin developed a bottle of a particular shape for its line of cordials. The bottle is 10 and 3/4 inches high, with a beveled or tapered bottom. Jacquin has consistently used this same shape of bottle for all the cordials in its line. Jacquin promotes its cordials through billboards, print ads, and other materials. The district court found that approximately 75 per cent of Jacquin's promotional materials include the bottle as part of the advertisement.
 
 
 7
 In 1985, representatives of Peter Harvey Wines ("PHW") suggested to DSI that it produce a rum-based schnapps which PHW would market in the United States. The representatives of PHW suggested that the rum schnapps be sold in a bottle similar to the bottle used for Blackstone whiskey in Mexico. The Blackstone whiskey bottle has a beveled bottom. In 1986, DSI submitted a Blackstone whiskey bottle to Owens-Illinois, Inc., a bottle manufacturer, to use as a sample. DSI instructed Owens-Illinois to increase the height of the bottle to 10 inches and to make a few other minor adjustments.
 
 
 8
 The bottle developed by Owens-Illinois became the bottle DSI uses for Don Juan rum schnapps in the United States. The Don Juan bottle is shorter than Jacquin's, and Jacquin's bottle has a longer neck. The Don Juan bottle has an eight sided cross-section while the Jacquin's bottle has a four sided cross-section. However, the Don Juan bottle has a similar appearance to the Jacquin's bottle when viewed from the front, primarily because both have beveled bottoms.
 
 
 9
 In the fall of 1987, DSI sold 2,700 cases of Don Juan schnapps to Crown for distribution in the United States. Crown sold Don Juan in New York, Michigan, New Jersey, Massachusetts, Florida, Virginia, New Hampshire, Pennsylvania, Vermont and Maine. In February 1988, Jacquin sent a cease and desist letter to Crown, alleging that the Don Juan bottle infringed on Jacquin's distinctive trade dress. Later that year, DSI repurchased 1,421 unsold cases of Don Juan from Crown.
 
 
 10
 Jacquin filed suit alleging that the Don Juan bottle infringed on its trade dress in violation of section 43(a) of the Lanham Act, 15 U.S.C. Sec. 1125(a)[2], and common law. Jacquin sought compensatory and punitive damages, as well as injunctive relief. At trial and following Jacquin's case in chief, the district court directed a verdict for DSI on Jacquin's compensatory and punitive damage claims. The district court concluded that Jacquin had failed to demonstrate actual consumer confusion and thus compensatory damages under section 43(a) of the Lanham Act were inappropriate. On Jacquin's claim for punitive damages under Pennsylvania common law, the district court concluded that Jacquin's evidence that DSI had intentionally copied Jacquin's bottle was insufficient.
 
 
 11
 On Jacquin's request for injunctive relief, the district court concluded that Jacquin could obtain injunctive relief if it demonstrated secondary meaning in its trade dress and a likelihood of consumer confusion. The district court denied DSI's motion for a directed verdict on this claim, holding that secondary meaning in the bottle design and a likelihood of consumer confusion were issues best left to the jury. After DSI presented its case, the jury was asked to answer two special interrogatories:
 
 
 12
 1) Has the shape of the plaintiff's bottle acquired secondary meaning?
 
 Yes No
 
 13
 (If your answer to this question is "yes," please go to the next question. If it is "no," your deliberations are over; please return to the courtroom.)
 
 
 14
 2) Is defendants' bottle as it appears in the market-place likely to lead consumers to think that the defendant's product was produced by the plaintiff or some entity related to the plaintiff?
 
 Yes No
 
 15
 The jury answered "yes" to both questions.
 
 
 16
 In response to the parties' post-verdict motions, the district court considered whether it was bound by the jury's verdict, since the only claim remaining when the case went to the jury was for equitable relief. The court concluded that it would not have been bound, had it notified the parties that the jury would be advisory only. Since it did not notify the parties, the court decided that it was bound by the jury's verdict. Neither party contests this decision.
 
 
 17
 The court then considered the extent of injunctive relief available to Jacquin. Although the jury found that Jacquin's bottle had acquired secondary meaning, it had not determined in which markets the bottle had acquired this status. The district court, after a thorough review of Jacquin's sales records, concluded that the bottle had acquired secondary meaning only in Pennsylvania, and issued an injunction prohibiting DSI from using its bottle for cordial or specialty beverages in Pennsylvania. Jacquin appeals.
 
 II.
 
 18
 The first issue is whether the district court erred by directing a verdict in DSI's favor on the issue of punitive damages. Our review is plenary. A verdict may only be directed if, viewing the evidence in the light most favorable to the non-moving party, there is no issue of material fact and only the verdict directed would be correct under the governing law. Macleary v. Hines, 817 F.2d 1081, 1083 (3d Cir.1987).
 
 
 19
 Jacquin's claim for punitive damages is governed by Pennsylvania law. Pennsylvania follows section 908(2) of the Restatement (Second) of Torts and allows punitive damages only for "conduct that is outrageous, because of the defendant's evil motive or his reckless indifference to the rights of others." Kirkbride v. Lisbon Contractors, Inc., 521 Pa. 97, 555 A.2d 800, 803 (1989) (quoting Restatement (Second) of Torts Sec. 908(2)). The district court found no evidence to support an award of punitive damages.[3]
 
 
 20
 Jacquin conceded at oral argument before us that it had offered no direct evidence of DSI's outrageous conduct, evil motive or reckless indifference in designing its Don Juan bottle. Jacquin contends, nonetheless, that bad intent can be inferred from the striking similarity between its bottle and the Don Juan bottle, the prominence of Jacquin's bottle in the marketplace, and the fact that DSI continued to use the Don Juan bottle after Jacquin had notified it that the bottle might infringe Jacquin's trade dress.
 
 
 21
 Assuming that covert copying of a non-trademarked package is outrageous conduct, there was simply no evidence that DSI willfully set out to copy Jacquin's bottle. The only testimony about the origin of the Don Juan bottle was elicited by Jacquin itself on direct examination--the unequivocal statements by Irwin Goldberg of Crown and Alberto Torruella of DSI that they used the Blackstone whiskey bottle as a model for DSI's rum schnapps bottle.[4] Jacquin's bald assertion that its bottle design was so well known that DSI must have been intentionally copying does not make a prima facie case for punitive damages.
 
 
 22
 Similarly, the fact that DSI continued to market Don Juan after receiving Jacquin's cease-and-desist letter does not support a finding of outrageousness. See e.g. Andy Warhol Enterprise, Inc. v. Time Inc., 700 F.Supp. 760, 766 (S.D.N.Y.1988) (continuing use of trademark after notification not sufficient for finding of bad faith). Jacquin's argues that continued use of a mark demonstrates the defendant's willfulness. We find this argument unpersuasive in a case where there is no registered mark, but only an asserted right to protection of a distinctive trade dress. Since there was no evidence of outrageous conduct or willful disregard for Jacquin's rights, the district court did not err by granting a directed verdict in favor of DSI.
 
 III.
 
 23
 The district court fashioned an injunction to protect Jacquin's bottle in markets where it had established such market penetration that DSI's bottle would present a real likelihood of confusion among consumers. The court concluded that Jacquin only had significant market penetration in Pennsylvania. Jacquin argues that it was entitled to protection in other markets.
 
 
 24
 We review the district court's injunction for abuse of discretion. A district court has abused its discretion if it has rested its decision on "a clearly erroneous finding of fact, an errant conclusion of law, or an improper application of law to fact." International Union, UAW v. Mack Trucks, Inc., 820 F.2d 91, 95 (3d Cir.1987). Jacquin argues that, since a jury determined that secondary meaning and a likelihood of confusion existed in this case, we owe less deference to the district court. We disagree. Although the district court was bound by the jury's finding on likelihood of confusion, the special interrogatories did not direct the jury to consider specific markets. Rule 49(a) of the Federal Rules of Civil Procedure states that in a case decided by special verdict, if the district court fails to charge the jury on a fact issue raised by the pleadings or evidence the parties waive their right to a jury trial on that issue unless they object. In crafting injunctive relief, the district court properly supplied its own factual findings to supplement the jury's special verdict. Hence, when reviewing its execution of this task, we will only reverse the district court if it abused its discretion.
 
 
 25
 The proper geographic scope of an injunction in a trademark infringement case is determined by examining the market penetration of the mark. An injunction is appropriate only if the market penetration is "significant enough to pose the real likelihood of confusion among the consumers in that area."[5] Natural Footwear Ltd. v. Hart, Schaffner & Marx, 760 F.2d 1383, 1397 (3d Cir.), cert. denied, 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985) (quoting Sweetarts v. Sunline, Inc., 380 F.2d 923, 929 (8th Cir.1967)). Market penetration of a trademark is determined by: "(1) the volume of sales of the trademarked product; (2) growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area." Natural Footwear, 760 F.2d at 1398-99.
 
 
 26
 We examine the market, as the district court did, by reference to state boundaries. Although state boundaries are not always appropriate delineators of markets, see Natural Footwear, 760 F.2d at 1398 n. 34, alcoholic beverages are distributed and regulated on a state-by-state basis, and state boundaries are uniquely proper for defining their markets. State markets are generally divided into "control" states, where the sale and distribution of alcohol is strictly regulated by the state, and "open" states, where state control is minimal. Jacquin sells its cordials in both "open" and "control" states.
 
 
 27
 In Natural Footwear, we reviewed the market penetration of a New Jersey based clothing manufacturer. We determined that we need only consider market penetration in two states outside of New Jersey, since the clothing manufacturer had failed to establish sales above $5,000 per year or a total of over 50 customers for any one year in any other states. Jacquin argues that, since its sales of cordials exceeds $5,000 per year in Alabama, Delaware, Iowa, Maryland, New Hampshire, New Jersey, North Carolina, Rhode Island, Vermont, Virginia, West Virginia, its market penetration is more than de minimis and it is entitled to protection in those states. Jacquin misunderstands our holding in Natural Footwear. Surpassing the de minimis threshold did not result in automatic protection for the clothing manufacturer in Natural Footwear. In fact, we held that the market penetration in the two states surpassing the de minimis threshold was insufficient to warrant protection. Natural Footwear, 760 F.2d at 1403.
 
 
 28
 Jacquin argues that it has also surpassed the threshold set out in Wrist-Rocket Manufacturing Co., Inc. v. Saunders Archery Co., 578 F.2d 727, 733 (8th Cir.1978). In Wrist-Rocket, the court set a ratio of one sale of the product in question per 20,000 persons as a threshold for establishing secondary meaning. Jacquin's efforts to treat these cases as establishing bright line tests is misguided. Whether a volume of sales is significant will vary with the product and the market. The numbers that result in injunctive relief in one case may not be significant in another.
 
 
 29
 In determining that Jacquin had only established secondary meaning and likelihood of confusion in Pennsylvania, the district court relied primarily on the volume of sales prong of the Natural Footwear test. The district court summarized Jacquin's sales volume in the following chart:
 
 
 30
 STATE JACQUIN SALES TOTAL SALES PERCENTAGE
Alabama 371 67,622 5.4
Iowa 311 213,095 .14
New Hampshire 7,921 306,044 2.58
North Carolina 2,971 175,680 1.69
Vermont 315 82,469 .38
Virginia 12,112 225,034 .53
West Virginia 5,771 59,705 3.8
Pennsylvania 219,918 945,223 23.26
 
 
 
 The district court concluded from these numbers that, since Jacquin's sales were less than three percent in all but two areas other than Pennsylvania, Jacquin's had failed to demonstrate "sufficient market penetration to warrant injunctive relief in any state but Pennsylvania." At 666.
 There are several mathematical errors in the calculation of percentages in the above table. The correct percentages for Alabama, Virginia, and West Virginia are .54, 5.38, and 9.66, respectively. The first error is of little consequence, since the correct percentage reveals sales even lower than the district court believed. The second two errors, however, are more troubling. The correct percentages for Virginia and West Virginia indicate that sales in those states may well support a finding of market penetration sufficient to establish secondary meaning. The district court's findings in this respect are incomplete, since it is unclear what share of the market other cordials makers commanded. A three percent share may seem small in absolute terms, but if no other maker has more than a few percent share, three percent may be significant.
 Since the district court crafted this injunction based on clearly erroneous fact findings, we will vacate the district court's injunction to the extent it limited protection to Pennsylvania. We will remand for the district court to make appropriate findings on Jacquin's market penetration in other states. We remand rather than conduct this analysis ourselves because it is not clear where the district court obtained some of the numbers it relied on. Jacquin submitted into evidence two annual reports of the National Alcoholic Beverage Control Association ("NABCA"), an industry group that compiles sales statistics for alcoholic beverages in several states. The sales summaries in those reports, however, do not correspond to the numbers in the chart the district court produced in its opinion.[6] It may be that the numbers in the district court's opinion are the correct ones, but since we are unable to determine this from the record before us, we will remand.[7]
 IV.
 Jacquin challenges the district court's injunction because it limited protection of Jacquin's trade dress to "cordials and specialties." Jacquin argues that protection should have been extended to the larger class of "spirits," which would include whiskeys, rums, vodkas, and gins as well as brandies and liqueurs. The district court limited the injunction because Jacquin had failed to present any evidence that its trade dress had acquired secondary meaning within the distilled spirits market as a whole or that consumers of distilled spirits, as opposed to the subset of consumers of cordials and specialties, would likely be confused by DSI's trade dress. The district court noted that the evidence at trial concerned only Jacquin's cordials sales, and did not address the distilled spirits market as a whole.
 We stated the test for determining when an injunction should issue against infringing but non-competing products in Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225 (3d Cir.1978). Secondary meaning and likelihood of confusion are again the standards, but the analysis proceeds somewhat differently than when addressing geographic scope of protection. Makers of non-competing products may be enjoined from using a particular mark or trade dress where a consumer might assume that the non-competing product comes from the same source as the trademarked product. Ten factors should be considered in this regard: "(1) the degree of similarity between the owner's mark and the alleged infringing mark; (2) the strength of the owner's mark; (3) the price of the goods and other factors indicative of the care and attention expected of consumers when making a purchase; (4) the length of time the defendant has used the mark without evidence of actual confusion arising; (5) the intent of the defendant in adopting the mark; (6) the evidence of actual confusion; (7) whether the goods, though not competing, are marked through the same channels of trade and advertised through the same media; (8) the extent to which the targets of the parties' sales efforts are the same; (9) the relationship of the goods in the minds of consumers because of the similarity of function; (10) other facts suggesting that the consuming public might expect the prior owner to manufacture a product in the defendant's market, or that he is likely to expand into that market." Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 463 (3d Cir.1983) (citing Scott Paper, 589 F.2d at 1229).
 Applying this test to the evidence Jacquin introduced, we conclude that the district court properly limited this injunction to cordials and specialties. First, Jacquin's bottle and DSI's bottle are similar in outline, but the similarity of the bottle designs is lessened considerably when the bottles are viewed with their complete labeling. Jacquin only asserted secondary meaning in the shape of the bottle. In determining the secondary meaning and likelihood of confusion, however, we need to view the total package as a consumer would. As for the strength of Jacquin's trade dress, the district court found that it was prominent in only a few markets.[8]
 Jacquin presented no evidence to establish the third factor, the care with which consumers select cordials or distilled spirits. Indeed, Jacquin presented no consumer evidence whatsoever. It presented no consumer surveys to show consumer expectations or actual confusion, so likewise neither the fourth nor sixth factor favors Jacquin. The only evidence of DSI's intent in adopting its bottle shape was the testimony that the bottle was modeled on the Blackstone whiskey bottle.
 As to the seventh factor, there was evidence that, at least in the control states, all distilled spirits are marketed through the same channels and advertised similarly. Jacquin, however, has not demonstrated that the targets of its sales efforts for cordials are the same as any sales efforts DSI might direct toward consumers of other distilled spirits. Similarly, Jacquin introduced no surveys or other evidence showing that consumers would find that distilled spirits such as rum and vodka have a similar function as cordials. Finally, other facts indicate that consumers likely would not be confused by DSI using its bottle for rum or other distilled spirits. Jacquin does sell other distilled spirits, but does not package them in the same bottle as it uses for cordials. Evaluating all the factors of the Scott Paper test, we conclude that the district court did not abuse its discretion by limiting injunctive relief to cordials and specialties.
 V.
 DSI argues in its cross-appeal that the jury's findings of secondary meaning and likelihood of confusion should be vacated. DSI argues that the evidence presented to the jury was insufficient as a matter of law to support a finding of secondary meaning. DSI, however, failed to move for judgment n.o.v. after entry of the final verdict. Where a party has failed to move for j.n.o.v., we will not review the sufficiency of the evidence and direct a verdict for them. Woods v. National Life and Accident Ins. Co., 347 F.2d 760, 769 (3d Cir.1965); Anderson v. Haas, 341 F.2d 497, 502 (3d Cir.1965); 9 C. Wright & A. Miller, Federal Practice and Procedure Sec. 2540 (1971).
 DSI argues alternatively that the district court erred by refusing to instruct the jury on Jacquin's failure to conduct a consumer survey. Consumer surveys, in which a representative sample of the consumers of a product are presented with the parties' products in a controlled setting, are the most direct method of showing the likelihood of confusion created by an infringing defendant. Similarly, a plaintiff's failure to conduct such a survey where it has the financial resources to do so, could lead a jury to infer that the plaintiff believes the results of the survey will be unfavorable. Eagle Snacks, Inc. v. Nabisco Brands, Inc., 625 F.Supp. 571, 583 (D.N.J.1985).
 Nevertheless, we have not yet held that a consumer survey is mandatory to establish likelihood of confusion in a Lanham Act case and do not so hold in this case. While consumer surveys are useful, and indeed the most direct method of demonstrating secondary meaning and likelihood of confusion, they are not essential where, as here, other evidence exists. Accord Getty Petroleum Corp. v. Island Transp. Corp., 878 F.2d 650, 656 (2d Cir.1989); c.f. Yamaha Int'l Corp. v. Hoshino Gakki Co., Ltd., 840 F.2d 1572, 1583 (Fed.Cir.1988) (survey not necessary to show acquired distinctiveness under section 2(f) of the Lanham Act). Since a consumer survey was not necessary for Jacquin to prove its claim, the refusal of the district court to give the jury charge on failure to conduct a survey was not error.
 VI.
 We will affirm the district court's grant of a directed verdict in favor of DSI on the issue of punitive damages and its refusal to give DSI's requested instruction on consumer surveys. We will also affirm the district court's injunction to the extent that it limited protection to cordials and specialties, however, we will vacate and remand the portion of the injunction that limited protection to Pennsylvania for further proceedings in accordance with this opinion. Each side shall bear its own costs.
 
 
 [1]
 A third defendant, Howrene Wine & Spirit Inc., settled with Jacquin and is not before us in this appeal
 
 
 [2]
 Section 43(a) provides:
 Any person who shall affix, apply, or annex, or use in connection with any goods or services, or any container or containers for goods, a false designation of origin, or any false description or representation, including words or other symbols tending to falsely describe or represent the same, and shall cause such goods or services to enter into commerce ... shall be liable to a civil action ... by any person who believes that he is or is likely to be damaged by the use of any such false description or representation.
 This section has since been amended. See 15 U.S.C.A. Sec. 1125(a) (West supp.1990). Jacquin's Lanham Act claim alleged that DSI's packaging constituted a false designation of origin.
 
 
 [3]
 The district court also concluded, based on a narrow reading of Kirkbride, that punitive damages were not available unless compensatory damages were awarded. Because we find insufficient evidence of outrageous conduct, we do not review this alternative ground
 
 
 [4]
 This testimony was corroborated after the grant of the directed verdict by the testimony of Angel Paz of DSI and Dale Devore of Owens-Illinois. App. pp. 204, 174, 177
 
 
 [5]
 Likelihood of confusion and secondary meaning are two closely related concepts that collapse into one another in trade dress cases. "Secondary meaning exists when consumers seeing a trademark assume that the product it labels came from a particular source." Interpace Corp. v. Lapp, Inc., 721 F.2d 460, 462 (3d Cir.1983). Likelihood of confusion exists when two products are so similarly labelled or packaged that consumers are likely to be confused as to the source of the product. Necessarily, a package or mark must have acquired secondary meaning before likelihood of confusion can result. A consumer must recognize that a particularly packaged product comes from Source A before she can be confused by a similar package from Source B. Effectively, however, these concepts are "difficult to distinguish in viewing the evidence." 1 J.T. McCarthy, Trademarks and Unfair Competition Sec. 15:3 (1984), Interpace, Corp., supra
 
 
 [6]
 Apparently the district court relied on numbers supplied by Jacquin in its post-trial memorandum. Jacquin, however, has not included in this record the exhibit it submitted to the district court explaining how it calculated the numbers. Consequently, we cannot determine if Jacquin made some error, or relied on matters not in evidence, in calculating the totals
 
 
 [7]
 Similarly, we can not determine why the district court did not credit the apparently uncontested testimony of Kevin O'Brien, Jacquin's vice-president in charge of national sales, on Jacquin's sales in the "open" states of New Jersey, Delaware, Maryland, and Rhode Island. App. p. 147. There may have been reason for the district court to discredit this testimony. On remand, the district court will have an opportunity to fully address this point
 
 
 [8]
 Although we are remanding for additional findings on market penetration in some states, this is not inconsistent with our holding that Jacquin's trade dress was only established in some limited number of states