**CHARLES JACQUIN ET CIE, INC.**

v.

**DESTILERIA SERRALLES, INC., Crown Marketing International and Howrene Wine & Spirit, Inc.**

Civ. No. 88–3040.

United States District Court,
E.D. Pennsylvania.

Feb. 4, 1992.

Arthur H. Seidel, Stephen J. Meyers, Seidel, Gonda, Lavorgna & Monaco, P.C., Philadelphia, Pa., for plaintiff.

Albert Robin, Robin, Blecker, Daley & Driscoll, New York City, William H. Elliott, Jr., Synnestvedt & Lechner, Philadelphia, Pa., for defendants.

## MEMORANDUM

LOUIS H. POLLAK, District Judge.

In this action, the plaintiff, Charles Jacquin et Cie, Inc., ("Jacquin") alleges that defendants, Destileria Serralles, Inc., ("DSI") and Crown Marketing International ("Crown") infringed its trade dress in violation of section 43 of the Lanham Act, 15 U.S.C. § 1125(a), and state common law. At trial, the jury found that Jacquin had established that its trade dress had second-ary meaning. This court then entered an injunction prohibiting the defendants from infringing on the plaintiff's trade dress in the Commonwealth of Pennsylvania. Jacquin appealed, claiming that the injunction should have embraced a wider geographic area. The Court of Appeals agreed, and remanded to this court for reconsideration of the geographic scope of the decree. *See Charles Jacquin et Cie, Inc. v. Destileria Serralles, Inc.,* 921 F.2d 467 (3rd Cir.1990). Jacquin seeks extension of the injunction to cover the states of Alabama, Delaware, Maryland, New Hampshire, New Jersey, North Carolina, Rhode Island, Virginia, and West Virginia.

### I.  Facts and Procedural Background

Jacquin is a maker and seller of alcoholic beverages; the firm has been in business since 1884. According to Jacquin's figures, approximately one-half of its sales are of cordials. Norton J. Cooper, the principal shareholder and president of Jacquin, testi-fied that the firm formerly sold approxi-mately 300,000 cases of cordials per year, but that in recent years its sales have declined to about 250,000 cases a year.

In 1968, Jacquin developed a distinctively shaped 750 milliliter bottle for its line of cordials. Jacquin markets some of its cor-dials in bottles of other shapes and sizes, but this distinctive bottle, Jacquin's leading symbol, is featured in approximately 75% of Jacquin's advertisements, which include billboards, print ads, and other promotional materials.

Defendant DSI has been engaged in the sale of Puerto Rican rum since 1865. In 1986, anticipating the introduction of a new rum-based cordial, DSI requested that Ow-ens–Illinois, Inc., design a bottle for the new product, using a Blackstone whisky bottle as a model. The following year, DSI entered into an agreement with Crown to distribute Don Juan Schnapps, packaged in the new bottle, in the continental United States.

After sending DSI a cease-and-desist let-ter, Jacquin initiated this action in April 1988, alleging that the packaging of Don Juan Schnapps infringed the trade dress of Jacquin's cordial products in violation of

section 43 of the Lanham Act and state common law. Under the Lanham Act, Jacquin was required to show that its trade dress had acquired secondary meaning, such that a consumer viewing the trade dress would assume that it came from a particular source. *See Interpace Corp. v. Lapp, Inc.*, 721 F.2d 460, 462 (3rd Cir. 1983). The issue of secondary meaning was tried to the jury, which determined that Jacquin's trade dress had acquired secondary meaning. The jury was not asked, however, to determine the geographic region in which the trade dress had secondary meaning. Instead, the parties submitted post-trial memoranda in which they addressed the question of the extent of Jacquin's sales in several states. Based on the figures presented, I determined that Jacquin had established market penetration sufficient to create a likelihood of confusion only in Pennsylvania, and issued an injunction limited to that state.

The Court of Appeals reversed, finding error in both the mathematical calculations made and the standards applied. *See Jacquin*, 921 F.2d at 473–74. The Court of Appeals questioned the source of the numbers utilized and criticized the use of raw market share percentages, stating that this court must consider not only absolute market share, but also market share relative to the shares held by other cordials makers. *See id.* at 474. The Court of Appeals also suggested that this court explain why it did not credit the apparently uncontradicted testimony of Kevin O'Brien, Jacquin's Vice–President of National Sales, concerning Jacquin's market position in the states of New Jersey, Delaware, Maryland, and Rhode Island. *See id.* at 474 n. 7. On remand, this court must determine, in accordance with the Third Circuit's mandate, the extent of Jacquin's market penetration in states other than Pennsylvania and the proper scope of the injunction.

## II. The Legal Standard for Market Penetration

■ In determining the proper geographic scope of an injunction in a trademark infringement case, the court must determine the market penetration of plaintiff's product. Only if plaintiff's market penetration is "significant enough to pose a real likelihood of confusion among consumers in that area" is an injunction appropriate. *Natural Footwear, Ltd. v. Hart, Schaffner & Marx*, 760 F.2d 1383, 1397 (3rd Cir.), *cert. denied*, 474 U.S. 920, 106 S.Ct. 249, 88 L.Ed.2d 257 (1985). To assess the extent of plaintiff's market penetration, a court in this Circuit must consider four factors: "(1) the volume of sales of the trademarked product, (2) the growth trends (both positive and negative) in the area; (3) the number of persons actually purchasing the product in relation to the potential number of customers; and (4) the amount of product advertising in the area." *Id.* at 1398–99. Pursuant to the Eighteenth Amendment, the regulation of alcoholic beverages is a matter reserved to the several states, and each state independently regulates the sale of alcoholic beverages within its borders. Each state in which Jacquin markets its cordials is therefore an appropriate geographic area in which to evaluate Jacquin's market penetration. *See Jacquin*, 921 F.2d at 473.

## III. Application of the Legal Standard to Jacquin's Sales

### A. *Volume of Sales of the Trademarked Product*

■ In its brief, Jacquin continues to press the argument, presented previously both to this court and to the Court of Appeals, that because its sales in each of the states at issue exceeded the $5,000 per year amount treated as a *de minimis* threshold in *Natural Footwear*, it deserves injunctive relief in all those states. But the Court of Appeals, in reviewing Jacquin's claims, appears to have rejected this argument, stating: "Whether a volume of sales is significant will vary with the product and market. The numbers that result in injunctive relief in one case may not be significant in another." *Jacquin*, 921 F.2d at 473. *Natural Footwear* addressed the market for shoes, not the market for cordials; there is no assurance that a sales volume figure that is relevant in the shoe market will represent similar market penetration in the cordial market. I therefore

reject Jacquin's argument that *Natural Footwear* creates a broadly applicable threshold test.

Liquor industry terminology groups the states into two categories: "control" states, in which liquor sales are closely regulated, generally by limiting liquor sales to state-owned stores; and "non-control" states, which regulate the sale of liquor by private vendors. Because the available data differ for control and non-control states, the two groups must be considered separately.

### 1. Control States

Sales figures for the control states are available from the annual survey compiled by the National Alcoholic Beverage Control Association (NABCA). According to the NABCA figures for 1988, embodied in plaintiff's exhibit 51, Jacquin's sales of cordials in the control states in which Jacquin seeks protection were as follows:

| State | Jacquin's case sales | Total case sales | Percent | Rank |
|---|---|---|---|---|
| Alabama | 1,337 | 67,622 | 2.0% | 12 |
| New Hampshire | 11,112 | 306,044 | 3.6% | 8 |
| North Carolina | 5,915 | 175,680 | 3.4% | 10 |
| Pennsylvania | 251,374 | 945,223 | 26.6% | 1 |
| Virginia | 15,744 | 225,034 | 7.0% | 5 |
| West Virginia | 6,109 | 59,705 | 10.2% | 2 |

*See* Plaintiff's Exhibit 51, at A–378–380.

These figures present several difficulties which undermine their usefulness in determining whether Jacquin is entitled to injunctive relief. Perhaps most significantly, the NABCA figures are not restricted to 750 ml bottles. The 750 ml bottle is the only bottle that features the trade dress for which Jacquin seeks protection; to establish entitlement to injunctive relief, Jacquin must establish the market penetration, not of its products in general, but of its trade dress.

Jacquin contends that the 750 ml bottle accounted for approximately 81.7 percent of its overall sales in the control states. *See* plaintiff's exhibit 69. The evidence relied upon to produce this figure, however, is subject to numerous difficulties. First, the figures in exhibit 69 are derived from sales for the first quarter of 1989, rather than from the 1988 sales that are listed in the NABCA summary. It is not clear that we may safely assume that the percentage of sales for the 750 ml bottle was the same or substantially the same for the two periods. Second, exhibit 69 ap-pears to be based on an incomplete survey of the Jacquin product line. Perusal of the NABCA sales figures for 1988 indicates a large volume of sales of various flavored schnapps that, for whatever reason, are not among the products listed in exhibit 69. While the proportion of sales represented by the 750 ml bottle for the products not listed in exhibit 69 may not be vastly different from that for the listed products, we may not safely assume that the 81.7 percent figure is accurate for Jacquin's entire line of cordials. Moreover, Jacquin has failed to introduce evidence sufficient to establish, as more probable than not, that the proportion of sales accounted for by the 750 ml bottle is roughly identical in all states. I therefore may not conclude that, even if the 81.7 percent figure is accurate for the control states collectively, it applies to the states individually.[1]

The NABCA figures present an additional difficulty: they are internally inconsistent. For example, the sum of Jacquin's 1988 sales of individually listed products in Virginia, according to the NABCA sum-

---

1. The failure of Jacquin to submit a state-by-state breakdown of sales accounted for by the 750 ml bottle is significant because, as the Court of Appeals noted, Jacquin is not entitled to rely on the jury's general finding of secondary meaning to prove penetration of individual markets.

mary, is 12,112 cases. *See* plaintiff's exhibit 51, at A–340–58. In its table of total sales, however, the NABCA credits Jacquin with sales of 15,744 cases in Virginia in 1988. Jacquin has offered no explanation for this discrepancy.

Bearing these difficulties in mind, I will proceed to analyze Jacquin's volume of sales in the individual control states.[2]

*Alabama*

■■■ Of the control states other than Pennsylvania, Jacquin, in 1988, was weakest in Alabama, where it had a market share of only two percent and ranked a distant twelfth among sellers of cordials. I conclude that this amounts to only a *de minimis* presence, and that no further analysis of that state is required.

*North Carolina*

■ In North Carolina, Jacquin had a 3.4 percent share of the market, and ranked tenth in the market. Six makers had sales of over 10,000 cases in 1988, compared with Jacquin's sales of 5,915 cases. Jacquin's presence in North Carolina is perhaps more than *de minimis*. The fact that a party has more than a *de minimis* presence in a market, however, does not automatically entitle it to protection. *See Natural Footwear*, 760 F.2d at 1403. Because of Jacquin's relatively weak presence in North Carolina as established by the NABCA figures, taking into account the difficulties with those figures as described in greater detail above, I conclude that Jacquin has made a weak showing for extension of relief to North Carolina under the first factor of the *Natural Footwear* test, volume of sales. Unless Jacquin can make a strong showing of entitlement to relief under the other three factors, it is not entitled to have the injunction include North Carolina. *See id.*

*New Hampshire*

Jacquin's presence in the New Hampshire market in 1988 was similar to its presence in the North Carolina market. In New Hampshire, Jacquin ranked eighth among makers of cordials, with a market share of 3.6 percent. Three makers had sales of over 30,000 cases, compared with Jacquin's sales of 11,112 cases. Jacquin has thus made only a weak showing of market penetration in New Hampshire under the first factor of the *Natural Footwear* test, volume of sales.

*Virginia*

Jacquin had a stronger presence in Virginia than it did in New Hampshire, North Carolina, or Alabama in 1988. Jacquin's sales totalled 15,744 cases, giving Jacquin a seven percent share of the market. Were these figures wholly reliable, Jacquin would have made a strong showing of market penetration based on volume of sales. Because the figures are open to question, however, I conclude that Jacquin's showing on the first factor of the *Natural Footwear* test is insufficient, standing alone, to establish Jacquin's entitlement to relief.

*West Virginia*

According to the 1988 NABCA figures, Jacquin ranked second among distributors of cordials in West Virginia, with a 10.2 percent share of the market. Despite the difficulty with the NABCA figures, this amounts to a strong showing of market penetration in West Virginia.

2. Non-control States

Jacquin failed to produce sales figures for the non-control states, claiming that it no longer retains sales data broken down by state and product for fiscal years prior to 1990.[3] *See* Declaration of Kevin O'Brien, at 1. Instead, it relies on the testimony of Kevin O'Brien, its Vice–President of National Sales, who testified not to Jacquin's volume of sales in the non-control states but to its relative market share in those states. According to Mr. O'Brien,

---

2. I have already determined that Jacquin is entitled to injunctive relief in Pennsylvania, and will not reconsider that decision here.

3. The failure to preserve earlier sales figures is odd: it should have been apparent to Jacquin back in 1988, when Jacquin filed its complaint in this law suit, that the sales figures would very likely be relevant to the matters in controversy.

Jacquin's rank in the non-control states was as follows:

| State | Rank | Market Share |
|---|---|---|
| New Jersey | | 10–15% |
| Southern New Jersey | 1 | |
| Northern New Jersey | 2 or 3 | |
| Delaware | 1 | 20–25% |
| Maryland | 2 | 15–20% |
| Rhode Island | 1 | 20–25% |

Jacquin argues that this testimony, which was uncontradicted at trial, must be accepted, and that it establishes sufficient market penetration to warrant injunctive relief in the four non-control states. In addition, Jacquin seeks to buttress Mr. O'Brien's trial testimony by submitting a new sworn declaration by Mr. O'Brien setting forth estimated dollar volumes of sales in these states for the years 1985–1990. According to those estimates, Jacquin's sales of cordials and specialties for 1988, the year on which Jacquin bases its claim of protection, were as follows:

| State | Dollar Volume of Sales |
|---|---|
| Delaware | $ 621,791.77 |
| Maryland | 1,572,466.11 |
| New Jersey | 6,815,096.35 |
| Rhode Island | 2,109,315.32 |

If the testimony and sworn declaration of Mr. O'Brien can be relied on, Jacquin's share and rank in the cordial market for the non-control states of Delaware, Rhode Island, Maryland, and New Jersey would easily entitle Jacquin to injunctive relief. The figures presented by Mr. O'Brien, however, present several difficulties. First, his market share figures do not isolate sales in the 750 ml bottle, which is the only bottle subject to this litigation, from total sales. Although Jacquin has submitted figures for the control states suggesting that in those states sales in the 750 ml bottle represent 81.7 percent of its total sales, it has presented no evidence that the same proportion exists in all or any of the non-control states.[4] But if, *arguendo*, one assumes that the 81.7 percent figure has

some applicability to each of the non-control states, and if Mr. O'Brien's dollar sales estimates include more than just the 750 ml bottle, those figures overstate Jacquin's position with regard to the bottle that is the subject of this litigation by a significant amount.

Second, Mr. O'Brien presented no figures or sources that would support his estimates. Although Mr. O'Brien, as Vice President of National Sales, can be assumed to know something about the sales record of Jacquin's products, the lack of supporting figures is troubling. This is especially so because, at trial, Mr. O'Brien accepted a peculiar method of calculating market share. On cross-examination, Mr. O'Brien first agreed with the estimate of Mr. Cooper, Jacquin's president, that Jacquin had a 60 percent share of the market for cordials in Pennsylvania, despite the fact that Jacquin's sales accounted for only 251,374 of the 945,223 cases of cordials sold in Pennsylvania in 1988, giving it 26.6 percent of the overall market. When confronted with this discrepancy, Mr. O'Brien explained that the 60 percent figure was derived from an average of Jacquin's share of the markets for individual types of cordials. Because, evidently, Jacquin dominates the markets for small-volume specialty cordials and is less successful in the markets for more popular types, an average calculated in this manner could grossly overstate Jacquin's actual total market share. It is not clear whether Mr. O'Brien used this same method in making his estimates of Jacquin's market share in the non-control states; if he did use this method, then his estimates are entitled to little weight.

Third, the dollar sales figures supplied by Mr. O'Brien are themselves problematic. Norton Cooper, Jacquin's president, testified that the 251,374 cases sold in Pennsylvania accounted for between 75 and 80 percent of Jacquin's total sales of cordials. If this figure is accurate, then Jacquin did not sell more than 335,165 cases of cordials

---

**4.** The 81.7 percent figure is itself problematic, for the reasons discussed more fully in Part III.A.1, *supra.*

in 1988, and Jacquin's non-Pennsylvania sales could not have exceeded 83,791 cases. Yet, according to Mr. O'Brien's sales figures,[5] Jacquin would have sold approximately 14,696 cases in Delaware, 37,165 cases in Maryland, 161,075 cases in New Jersey, and 49,854 cases in Rhode Island. This would give Jacquin total sales in these four states of 262,790 cases of cordials, a figure that cannot be reconciled with Mr. Cooper's testimony.

■ One other factor needs to be addressed. The Court of Appeals made clear that we must assess Jacquin's position not merely in absolute terms but also in relative terms, comparing Jacquin's market position with that of other producers of cordials. With respect to the non-control states, Jacquin has failed to introduce any evidence that would allow such a comparison, other than Mr. O'Brien's assertions that Jacquin ranked first in southern New Jersey (itself not a relevant geographic unit), Delaware, and Rhode Island, and second in Maryland. Given the difficulties in the rest of Mr. O'Brien's testimony, I am unwilling to accept these assertions without support. In short, Jacquin has failed to introduce credible evidence of its volume of sales in the four non-control states sufficient to justify injunctive relief extending to those states.

### B. *Growth Trends*

The second factor in the *Natural Footwear* test is the existence of positive or negative growth trends in the market penetration of the mark for which protection is sought. A mark that has only small market penetration may be entitled to protection if there are strong indications of positive growth; in contrast, a mark with marginal market penetration whose market presence is in decline will not be entitled to protection. In the present case, little evidence was introduced of Jacquin's growth trends, either positive or negative. What little evidence exists suggests that Jacquin's sales are declining, but that this

decline is part of an overall decline in the market for cordials. Jacquin has not submitted evidence of positive or negative growth trends in the particular states in which it seeks protection.

### C. *Number of Purchasers*

The third factor in the *Natural Footwear* test is the number of persons purchasing the product in relation to the potential number of customers. This factor allows the factfinder to take into account peculiarities in the individual product market.

#### 1. Control States

Jacquin submitted no evidence of the number of persons actually purchasing the product in relation to the potential number of customers in the control states. It did submit evidence of the ratio of actual *bottles sold* to state population. This evidence is ambiguous for several reasons. First, the potential number of purchasers of alcoholic beverages is, obviously, smaller than the total population, since any state must, of necessity, contain a certain number of young people under the age of 21. This factor, of course, may be interpreted as weighing in Jacquin's favor, as it would reduce the number of individuals who could be considered potential customers. But second, the evidence fails to give any kind of consideration to the rate at which individuals who purchase Jacquin products are repeat purchasers. Cordials are not the type of product that a court may safely assume a consumer purchases only once a year. To the extent that the court must consider the actual number of *customers,* as opposed to the actual number of bottles sold, the evidence presented by Jacquin, the party that bears the burden of proof, is inadequate. *See Natural Footwear,* 760 F.2d at 1399.

Jacquin argues, as it did before the Court of Appeals, that its sales greatly exceeded the ratio of one sale per 20,000 persons used as a threshold of secondary

---

**5.** These figures are calculated using the per case price of $42.31, derived from Jacquin's trial exhibit 50.

meaning in *Wrist–Rocket Manufacturing Co. v. Saunders Archery Co.,* 578 F.2d 727 (8th Cir.1978). The Court of Appeals has already rejected the use of the *Wrist–Rocket* standard as a bright-line test. *See Jacquin,* 921 F.2d at 473. Jacquin, in its continued reliance on *Wrist–Rocket,* makes no argument as to why the market for the product in question in that case—a wrist-braced slingshot—is in any way comparable to the market for cordials that is at issue here. As the Court of Appeals noted, the significance of a particular volume of sales or ratio of sales per customer can only be determined by looking at the particular product for which the plaintiff seeks trademark protection. *See id.*

### 2. Non-control States

Jacquin has failed to present any evidence comparing the number of actual customers to the number of potential customers in the non-control states. To the extent that Jacquin relies on its sales figures for those states as evidence relevant to this factor, that evidence is inadequate, for the reasons described more fully above.

### D. *Product Advertising*

Product advertising, the fourth factor in the *Natural Footwear* test, is particularly significant in assessing market penetration of a mark for which protection is sought, because advertising is intended to increase the public's familiarity with the mark. Jacquin introduced evidence that it spent approximately three-quarters of a million dollars on advertising and promotion during the years 1986, 1987, and 1988. Jacquin also introduced evidence that it featured the design of its 750 ml bottle in approximately 75 percent of its advertisements. The evidence of how Jacquin's advertising expenditures were spread over the states at issue was vague, however. Mr. Cooper, Jacquin's president, testified that Jacquin's print advertising ran exclusively in Pennsylvania, and that Jacquin's billboards appeared in Pennsylvania, Rhode Island, southern New Jersey, Delaware, and New York. No evidence was introduced as to the number of billboards in these various states. In addition, Jacquin introduced no

evidence that it advertised, or featured its trade dress in advertisements, in Alabama, Maryland, New Hampshire, North Carolina, Virginia, or West Virginia. The evidence of advertising, as currently constituted, does little to further Jacquin's bid for injunctive relief.

### IV. Conclusion

■ Jacquin has submitted evidence that, if taken at face value, would warrant extension of injunctive relief to several states in addition to Pennsylvania. A close examination of the figures presented by Jacquin, however, reveals numerous ambiguities, virtually all of which strongly suggest that the raw figures that Jacquin submitted overstate the market penetration of Jacquin's trade dress. Moreover, Jacquin has failed to bolster its evidence of volume of sales and market share with evidence of growth trends, sales in relation to customers, and advertising in the relevant markets. Trademark protection involves a form of monopoly, *see Natural Footwear,* 760 F.2d at 1396, and courts should be reluctant to grant exclusive use of a particular trade dress on the basis of internally inconsistent evidence.

■ I have previously determined that Jacquin is entitled to an injunction covering the state of Pennsylvania. In addition, Jacquin has introduced sufficiently compelling evidence of market penetration in West Virginia to warrant the extension of injunctive relief to that state. As for the other states, however, Jacquin has failed to make a showing, under the four-part *Natural Footwear* test, to merit protection of its trade dress in those states.

The substance of the analysis set forth in this Memorandum was presented to the parties, as the tentative conclusions of the court, at a conference on January 8, 1992, with a request that the parties present such written comment as they felt appropriate. The parties then filed further submissions which, while not abandoning their respective prior submissions, did not undertake to challenge in any detail the tentative conclusions. I will therefore order that defendant be enjoined from selling its prod-

ucts in the trade dress that is the subject of this litigation in Pennsylvania and West Virginia. Jacquin's petition for relief in additional states is denied.